**UNITED STATES of America, Appellee,**

v.

**Donald F. LARSON, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Kenneth James CALLAHAN, Appellant.**

**Nos. 78–1033, 78–1051.**

United States Court of Appeals, Eighth Circuit.

Submitted June 12, 1978.

Remanded July 7, 1978.

Decided Jan. 26, 1979.

Rehearing and Rehearing En Banc Denied May 21, 1979.

---

Ronald I. Meshbesher, Meshbesher, Singer & Spence, Ltd., Minneapolis, Minn., and Bruce Hartigan, Minneapolis, Minn., for appellants; Carol M. Grant and Bruce Hartigan, Minneapolis, Minn., on brief.

Thorwald Anderson, Jr., Asst. U. S. Atty., Minneapolis, Minn., for appellee; Andrew W. Danielson, U. S. Atty., Minneapolis, Minn., on brief.

Before BRIGHT, Circuit Judge, INGRAHAM, Senior Circuit Judge,* and STEPHENSON, Circuit Judge.

* JOE M. INGRAHAM, United States Senior Circuit Judge, Fifth Circuit Court of Appeals, sitting by designation.

BRIGHT, Circuit Judge.

Appellants Kenneth Callahan and Donald Larson appeal from convictions following a jury trial for having unlawfully seized, confined, and kidnapped Virginia L. Piper for one million dollars ransom, and for having willfully transported her in interstate commerce, from the State of Minnesota to the State of Wisconsin and thence back to Minnesota, in violation of 18 U.S.C. § 1201 (1976). The district court sentenced each appellant to a term of life imprisonment.

Callahan and Larson present the following contentions on appeal:

1) the evidence of appellants' involvement in the kidnapping and the evidence of interstate transportation, supporting federal jurisdiction, are insufficient as a matter of law to justify the conviction;

2) the district court abused its discretion in denying appellants' motion to reopen the case to hear the testimony of Lynda Lee Billstrom; [1]

3) the district court erred in refusing to admit, as a statement against penal interest made by an unavailable witness, a thirty-six page statement made to the FBI by Ms. Billstrom, which purportedly aids in establishing appellants' innocence;

4) by excluding evidence that the Government offered leniency to various convicts for cooperation in testifying for the prosecution, the district court prevented appellants from supporting their theory that the Government framed them. In addition, the court abused its discretion by failing to instruct the jury on a defense theory that the Government fabricated evidence against them;

5) the district court erred in failing to order a physical and psychiatric examination and in refusing to admit into evidence an impeaching medical evaluation of John Dineen, a narcotics user who testified as a witness for the Government;

6) the Government, by failing to disclose evidence that Callahan passed a

spelling test containing some of the words misspelled in the ransom notes, and the court, in not ordering a new trial on the basis of this information, denied appellants due process of law;

7) unauthorized experiments conducted by certain jurors during deliberations deprived appellants of their right to confront and cross-examine adverse witnesses;

8) the district court's alleged communication with the jury, without notice to appellants or their counsel, violated appellants' right to be present at every stage of their trial; and

9) the district court's refusal to conduct an evidentiary hearing to explore allegations of the Government's nondisclosure of a spelling test, unauthorized jury experiments, improper jury communications, and the prejudicial impact resulting from the jury being trapped in an inoperable elevator for one and one-half hours on the last day of deliberations, deprived appellants of a fair trial.

Upon examination of the entire record in this case, including the supplementary material developed on remand, we reject appellants' claims numbered 1, 3, 4, and 5, and we find it unnecessary to decide issues 6 through 9. We conclude that the denial of the motion to reopen the trial for the purpose of presenting the testimony of Ms. Billstrom (appellants' claim no. 2) seriously prejudiced appellants' defense and requires a retrial of Callahan and Larson.

I. *Factual Background.*

Two masked, hooded men dressed in black invaded the home of Virginia L. Piper and her husband, Harry Piper, in Orono, Minnesota, a suburb of Minneapolis, at approximately one o'clock on Thursday afternoon, July 27, 1972, and abducted Mrs. Piper. A ransom note left in the house demanded $1,000,000 in $20 bills for the return of Mrs. Piper. Handcuffed and forced

---

1. In this opinion we refer to the witness as Lynda Lee Billstrom, the name she gave in her remand testimony. The record also refers to

her as Lynda (or Linda) Lee Burt, Lynda Burt (or Bert), and Lynda Burt Billstrom.

to lie on the backseat of a green 1972 Chevrolet Monte Carlo, Mrs. Piper became the unwilling companion of the kidnappers on their several-hour journey to a heavily wooded area of Jay Cooke State Park, a site in northeastern Minnesota near Duluth, Minnesota, and 140 miles north of Minneapolis. During the automobile trip, Mrs. Piper could feel the movements of the car and hear, but she could see nothing because the men had placed a pillowcase over her head. As they travelled, the kidnappers directed Mrs. Piper to tape record preliminary ransom delivery instructions.

Upon arrival at their destination, one of the kidnappers remained with Mrs. Piper in the park from Thursday afternoon, July 27, until Friday night, July 28. During that period, Mrs. Piper sat handcuffed with her back to the abductor and, although not blindfolded, was admonished to avoid looking at him. On one occasion, however, Mrs. Piper inadvertently turned and, for an instant, saw her abductor's features through the sheer nylon stocking he wore over his head. Mrs. Piper particularly noticed a red streak through his left eye and a white ring encircling his left eyeball. Mrs. Piper also observed that the kidnapper often rubbed his legs. From conversations with her abductor during the thirty-forty hours Mrs. Piper remained in his custody, she learned that he called himself "Alabama" and worked in construction. In addition, he commented upon the poor rehabilitative program at the St. Cloud Reformatory. The man offered Mrs. Piper some cheese, bread, and 7–Up, occasionally provided her with what she describes as menthol cigarettes, and gave her a pair of olive-brown wool pants and a sweater bearing a St. Olaf insignia to wear.

Meanwhile, Harry Piper arranged for the delivery of the one million dollar ransom in $20 bills. About 9:30 p. m. on Friday, July 28, Mr. Piper received a telephone call communicating his wife's tape recorded message. Pursuant to the recorded instructions, Mr. Piper drove with the ransom money in his automobile to a signpost at the intersection of Louisiana and Laurel Avenues in St. Louis Park, Minnesota. There he found a radio transmitter, which he placed on the dash of his car, and the first of a series of notes which directed him on an intricate ransom run. During the course of the ransom delivery, in conformance with the kidnappers' directions, Mr. Piper transferred the ransom money from his car to a green 1972 Chevrolet Monte Carlo [2] and drove the Monte Carlo to the Sportsman's Bar in north Minneapolis. Still following instructions, Piper made two calls from inside the bar, during which time someone removed the money from the trunk of the Monte Carlo.[3] Ultimately, Mr. Piper abandoned the car at a Holiday Village Store in a suburb south of Minneapolis, where the FBI recovered the vehicle.

Sometime Friday night, July 28, the kidnapper chained Mrs. Piper to a tree in Jay Cooke State Park and left. Mrs. Piper thought that hours had passed when finally she heard someone in the woods. A man wearing a white shirt, whose face she could not discern, approached her and asked, "Is everything all right * * * [w]here is Tom?" Mrs. Piper responded, "He is gone. He has been gone a long time[.]" That man left for a time, but he returned and conversed a bit longer, promising Mrs. Piper she would be rescued.[4] When he then departed, Mrs. Piper saw headlights and heard two short horn honks and a strange voice saying as a car drove away, "Grandma, grandma, we are going now."

The FBI rescued Mrs. Piper around noon on Saturday, July 29, following a telephone call made at 9:00 a. m. that day to Reverend Kenneth Hendrickson, a Lutheran minister

2. The Government contended the kidnappers drove the same green Monte Carlo during the abduction. The record contains ample evidence to support this hypothesis.

3. To the date of trial, only about $4,000 of the ransom money had been found in circulation.

4. Mrs. Piper apparently assumed, but does not know, that the man asking about Tom and the man assuring her of rescue were the same person.

in Golden Valley, Minnesota. An unknown male informed the Reverend that his number had been picked at random, and the caller relayed directions regarding Mrs. Piper's location. At about 2:15 p. m. on Saturday, after Mrs. Piper had been rescued, Alice Codden, an employee at the House of Charity in Minneapolis, also received a call from an unidentified man asking for a Brother DePaul. When informed of Brother DePaul's absence, the caller gave Ms. Codden a description of Mrs. Piper's location.

In the aftermath of the kidnapping, the FBI mounted an extensive investigation of the crime, employing as many as 250 agents to explore leads. The FBI concentrated primarily on interviewing persons in Minnesota with prior criminal records. FBI agents combed the recovery site at Jay Cooke State Park on several occasions and thoroughly searched the Monte Carlo employed in the crime for evidence.

Over the five years of the investigation, the FBI discovered numerous witnesses who made various identifications of suspects. Kenneth Callahan and Donald Larson were among the persons investigated, but the FBI apparently discounted them as suspects early in their search.

Eventually, however, all investigative efforts pertaining to the Piper kidnapping concentrated on Callahan and Larson. About March 1977, the FBI issued the following instruction to its agents:

No specific leads are being set forth at this time. All investigation is being directed toward development of evidence * * * with a goal to indict Callahan and Larson in the latter part of June, 1977 or early July '77[.]

The federal statute of limitations for the Piper kidnapping expired July 27, 1977. See 18 U.S.C. § 3282 (1976).

II. *Procedural History.*

On July 11, 1977, the United States indicted Kenneth Callahan and Donald Larson on the charge of kidnapping Mrs. Virginia L. Piper and transporting her in interstate commerce, in violation of 18 U.S.C.

§ 1201 (1976). The trial opened on October 11, 1977, and the jury received its instructions and commenced deliberation late in the afternoon of October 31. Although it apparently came to an impasse on November 2, the jury eventually returned a verdict on November 4, 1977, finding both Callahan and Larson guilty as charged. Following trial, Callahan and Larson moved for a judgment of acquittal and, alternatively, sought a new trial. The district court denied the motions, *United States v. Callahan*, 442 F.Supp. 1213 (D.Minn.1978), and this appeal followed.

As previously noted, appellants argued, among other contentions on appeal, that the district court erred (a) in denying their motion to reopen the trial to hear the testimony of Lynda Lee Billstrom, and (b) in permitting a communication with the jury without notice to appellants or their counsel. In order to fully evaluate these arguments, this court deemed it appropriate to request that a supplemental record be made and, in an unpublished order filed July 7, 1978, *United States v. Callahan and Larson*, Nos. 78–1051, 78–1033, remanded the case to the district court for the following limited purposes:

1) to have Ms. Billstrom testify as in a trial with such restrictions the trial judge deems necessary;

2) to clarify the record concerning appellants' efforts to secure Ms. Billstrom's testimony and relating to defense counsel's failure to reserve the right to reopen the case;

3) to provide the Government with the opportunity to make a record of proposed rebuttal evidence against Ms. Billstrom;

4) to provide appellants with the opportunity to make a record supporting their claim of an improper communication with the jury; and

5) on completion of the record on remand, the district court should make such supplementary findings as it deems appropriate relating to appellants' posttrial motion for a new trial.

On this limited remand, the district court conducted a hearing at which Lynda Lee

Billstrom testified, and the parties stipulated to the admission of a television interview of two jurors. In addition, the Government submitted its proposed rebuttal evidence in a letter to the district court dated July 26, 1978 (hereinafter referred to as remand letter). After reconsidering the issues before it, the district court made supplementary findings and again denied appellants a new trial. *United States v. Callahan*, 455 F.Supp. 524 (D.Minn.1978).

Upon consideration of the entire record in this case, we find that the denial of appellants' motion to reopen to present Ms. Billstrom's testimony substantially prejudiced Callahan and Larson and must be deemed trial error. We direct, therefore, that Callahan and Larson be retried.

In this opinion, we first review the sufficiency of the Government's evidence regarding appellants' involvement in the crime and the transportation of Mrs. Piper across state lines. Our examination of the motion to reopen issue then follows. Finally, we consider the remainder of appellants' contentions, finding no merit in some of the allegations, and deeming it unnecessary to decide others which will probably not recur in the course of a new trial.

### III. Sufficiency of the Evidence.

### A. Callahan and Larson's Connection to the Kidnapping.

In reviewing the sufficiency of the case linking Callahan and Larson to the crime, we examine the evidence and the inferences therefrom in the light most favorable to the Government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Muckenthaler*, 584 F.2d 240, 246 (8th Cir. 1978); *United States v. Overshon*, 494 F.2d 894, 896 (8th Cir.), cert. denied, 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974). The probative force of much of the circumstantial evidence presented during trial rested upon credibility determinations by the jury.

In its initial opinion, the district court fashioned a list of fourteen pieces of "significant evidence" purportedly connecting appellants to the kidnapping.[5] From

---

5. The list consisted of the following pieces of evidence:

1. Larson's fingerprint was found on a portion of a paper sack recovered from the car used to transport Mrs. Piper. The remainder of the sack was found in Jay Cooke State Park with the kidnap victim where it was used to hold food for Mrs. Piper.

2. Also found in the kidnap car, a Monte Carlo, was a strand of head hair microscopically identical to the known hair sample of defendant Callahan.

3. Callahan asked convict John Dineen at the Minnesota State Prison how to "launder" a large amount of $20 bills.

4. Larson was seen before the kidnapping by John Dineen wearing a distinctive St. Olaf College sweater like the one given by the kidnappers for Mrs. Piper to wear.

5. Pictures taken at his daughter's wedding in 1974 show Callahan to be identical in appearance to the artist's conception of the person who used ransom money to buy clothes from John Curdenas in 1974 at a suburban Minneapolis store.

6. Callahan was shown to be identical in appearance with the person passing ransom bills at several southern Minnesota banks in November of 1972.

7. Former convicts Harold Combs and Paul Harris saw Callahan and/or Callahan and Larson with handcuffs before the kidnapping. Defendants told Harris they bought them in Duluth. The handcuffs used to restrain Mrs. Piper were purchased in Duluth.

8. Before the kidnapping Larson inquired of Paul Harris as to what Harris knew about Harry C. Piper, husband of the victim.

9. Callahan spent consecutively numbered *Philadelphia Federal Reserve Notes* issued by a Philadelphia bank. Ransom twenty dollar bills were circulated in the Philadelphia area.

10. Callahan misspelled approach as "approuch" three times in one ransom note. He previously did the same in a letter to the Pardon Board.

11. Callahan's voice was identified as being like that of a kidnapper by four persons— Mrs. Piper; Bernice Bechdoldt, and Verretta Zimmerman, housekeepers at the Piper home; and Rev. Hendricks, to whom the kidnappers reported Mrs. Piper's place of confinement.

12. Larson was not at home at the time of the kidnapping and told his sister-in-law that he had been "up north fishing with Kenny."

13. Callahan smokes Kool cigarettes. Kool cigarettes were given to Mrs. Piper in the woods and were found near the scene of her captivity.

14. Callahan and Larson were long-time close friends and fellow participants in past criminal conduct.

this list, together with other evidence, the district court constructed a kidnapping narrative with Callahan and Larson as the abductors, *Callahan*, 442 F.Supp. at 1229–30.

Not every item on that evidence list represents "significant evidence" connecting appellants to the crime. Indeed, some of the evidence carries little probative value.[6] But when viewed as a whole, with certain reasonable inferences, the bits and pieces of evidence offered by the Government provided the jury with a sufficient basis to link Callahan and Larson to the kidnapping and its aftermath. We here review the quality of some of the important evidence to demonstrate that, although the case is an extremely close one, the Government's evidence possessed sufficient weight entitling the jury reasonably to determine that Callahan and Larson abducted Virginia Piper.

Soon after the kidnapping, the FBI found a scrap of paper with a fingerprint on it in the Monte Carlo automobile used by the kidnappers to transport Mrs. Piper. The scrap had been torn from a paper sack found in Jay Cooke State Park at the site where the kidnappers confined Mrs. Piper. The sack apparently had held food. Not until January 28, 1977, did an FBI expert identify the fingerprint on the paper scrap as Larson's. On three earlier occasions, FBI agents failed to identify the known print of Donald Larson with the latent print on the scrap of paper. During trial, an FBI fingerprint specialist explained the reason for the three previous failures in linking the print to Larson, testifying that FBI analysts had failed to make an important assumption in attempting to identify the unknown print, i. e., the fingerprint on the scrap of paper had been made by the holder of the sack twisting his little finger in a counterclockwise direction.[7]

A strand of hair, also found in the kidnap car in 1972, served to link Kenneth Callahan with the crime. In June/July 1977, FBI analysts determined the hair exhibited a range of microscopic characteristics similar to the characteristics of a known hair sample from Callahan.[8] Although a favorable microscopic comparison of two hair samples constitutes impressive circumstantial evidence that such samples came from the same person, the record indicates that microscopic comparisons do not constitute positive means of personal identification, for

[*Callahan*, 442 F.Supp. 1213, 1230–31 (D.Minn.1978).]

6. For example, the Philadelphia reserve notes are circulated throughout the country. The testimony of Toby Larson, Donald Larson's sister-in-law, suffered serious impeachment on cross-examination. And the Kool cigarette package was discovered at the Jay Cooke State Park kidnap site some two weeks after the FBI had thoroughly searched the area for clues. *See* note 5 *supra*, nos. 9, 12 and 13.

7. James K. Howell, a supervisory fingerprint specialist with the FBI, testified in part:

When you make comparisons, you must pick out two or more identifying characteristics lying in \* \* \* close proximity. Then you try to compare these two or more identifying characteristics in a latent print with those in any inked print that you might be comparing.

Now this latent fingerprint appears to me, and it's my opinion that a firm pressure was placed upon the object touched, then for some reason there was a clockwise twist to the finger upon the object thereby squeezing together some of your identifying characteristics obliterating others and making others somewhat fragmentary.

\* \* \* \* \* \*

My original analysis was incorrect, and I did feel that it was a true identifying characteristic.

Now that the identification has been effected, I can see where I was incorrect. \* \* \*

As I say this finger appears to be—have twisted counterclockwise and moved these ridges in and around obliterating some areas and in this area here. Taking the over-all abundance and identifying characteristics lying in the same relative position, I am positive in my opinion that the two fingerprints were made by the same individual.

Thus, it appears that the accuracy of the FBI identification rests upon the assumption that the person leaving the print twisted his little finger counterclockwise against a part of the paper. Without that assumption, as we understand the record, the lifted print would not have been described as possessing an adequate number of identifying characteristics to support its identification as Larson's print.

8. This identification postdated the FBI's instruction to its agents to focus the investigation on Callahan and Larson. *See supra* at 764.

human hair from different individuals may, on rare occasions, have identical microscopic characteristics.

In addition to this physical evidence, the Government relied on other pieces of circumstantial evidence to link appellants to the kidnapping.[9] In the end, the jury had before it a miscellaneous collection of evidence, some of it highly significant, but nevertheless subject to attack as to reliability. Three prior determinations of noncorrespondence weakened the impact of the fingerprint opinion linking Larson to the crime. The hair sample identification constituted nonconclusive opinion evidence. The sundry other types of identifications, although undercut in various degrees by doubts as to credibility, served as a whole to support the fingerprint and hair identifications. Considered together and in light of the Government's impeachment of the Callahan alibi defense, the evidence, as presented to the jury, supported an implication of guilt. We therefore conclude that the district court properly denied appellants' motion for judgment of acquittal and rightfully submitted to the jury the issue of appellants' guilt for the kidnapping.

### B. *Interstate Transportation.*

█ To establish a violation of 18 U.S.C. § 1201, the Government needed to prove that Callahan and Larson crossed state lines in kidnapping Mrs. Piper. The district court refused to instruct, as the Government requested, that interstate transportation could be presumed upon failure to release the victim within twenty-four hours. *Compare* 18 U.S.C. § 1201(b). The Government does not contest this ruling. In reviewing the jury finding of interstate transportation, we again examine the evidence in the light most favorable to the Government.

The Government sought to prove the interstate character of the kidnapping through the testimony of Mrs. Piper and an FBI agent who accompanied her on an attempted reenactment of the abductors' route. At trial, Mrs. Piper described the first and longest part of the trip as very quiet and smooth, as though travelling on a smooth road with moderate curves. The motion of the car then abruptly changed—it slowed somewhat and seemed to proceed through extreme curves. The car then slowed down drastically for the first time, and Mrs. Piper felt the vehicle cross railroad tracks. Thereafter, she sensed the car moving as though turning in circles and recalled going over what seemed to be a "kind of rough wooden bridge." She recalled that before reaching the bridge the car stopped or slowed almost to a stop. Following the bridge-crossing, the roughness of the road lasted for only a short period. Soon after entering onto a smoother road, the vehicle made a right turn and stopped.

Four months after the kidnapping, the FBI requested that Mrs. Piper reenact the likely route to the park taken by the kidnappers. The longest portion of the reenactment route commenced near Minneapolis on Interstate Highway 35 and moved in a northerly direction toward Carlton, Minnesota. At the interstate exit near Carlton, an FBI agent placed a pillowcase over Mrs. Piper's head and directed her to lie on the backseat of the automobile, in a manner similar to her position during the abduction. At Carlton, the FBI vehicle travelled east on state highway 210 until it reached Fond du Lac, Wisconsin. At Fond du Lac the vehicle turned sharply southwest onto state highway 23 [10] and continued toward Jay Cooke State Park. The journey terminated in the park with a right-hand turn off highway 23 onto an approach road leading into the woods. (The kidnappers had held Mrs. Piper approximately 200 yards from the entrance to this access road.) At trial, Mrs. Piper indicated her experience of the reen-

---

9. *See* note 5 *supra,* nos. 3–14. In addition, several Government witnesses identified Callahan through FBI composite sketches as a ransom money passer.

10. Although a small portion of Minnesota state highways 210 and 23 enter Wisconsin on this route, that portion of the road is maintained by the Minnesota Highway Department under an agreement with the State of Wisconsin.

actment route seemed similar to her recollection of the route followed by the kidnappers on July 27, 1972. The FBI did not take Mrs. Piper on any of the other possible routes from her home to Jay Cooke State Park.[11]

In response to Mrs. Piper's recollections of July 27, 1972, and testimony describing the supposed reenactment of the kidnappers' itinerary to the park, Callahan and Larson introduced evidence that nine different routes could be taken from the Piper home to Jay Cooke State Park. All nine routes require some travelling in a northerly direction on Interstate Highway 35 from the Minneapolis area. The route taken by the FBI on its reenactment follows the interstate to Carlton, Minnesota, turns east on 210, and enters Wisconsin before reaching the site of Mrs. Piper's confinement from the north. An alternative main route leaves Interstate Highway 35 near Sandstone, Minnesota, travels through Sandstone and follows state highway 123 north for a few miles, then joins state highway 23, and enters Jay Cooke State Park from the south. Another main route leaves the interstate at its junction with state highway 23 near Askov, Minnesota, then proceeds northeast for the balance of the trip, also entering the park from the south. Several secondary routes require travelling north on the interstate to its junction with state highway 210 near Carlton, Minnesota, then turning east on highway 210 and thence south and east on various county highways branching off of state highway 210. These county roads, which eventually merge with state highway 23 south of Jay Cooke State Park, do not appear on standard Minnesota highway maps. None of the routes from the Piper home, except the one relied on by the Government, pass through the State of Wisconsin enroute to Jay Cooke State Park.

Significantly, however, only the route of the FBI reenactment, crossing into Wisconsin on highway 210 and turning south on state highway 23, requires the *sharp right turn* to the approach road near her place of captivity that Mrs. Piper mentions in her testimony. All the other routes require some travel in a northeasterly direction on state highway 23, a southern entrance into the park and terminating the trip with a *sharp left turn* onto the approach road adjacent to the wooded area of Mrs. Piper's confinement.

Callahan and Larson attempt to undercut the interstate route theory by suggesting that Mrs. Piper's testimony describing the kidnap vehicle as seemingly turning in circles during the last part of the trip justifies an inference that the car entered the park from the south on highway 23, drove by the approach road, and reversed direction, thereby necessitating a right-hand turn at the approach road, without ever entering the State of Wisconsin. In addition, appellants rely on a conversation between Mrs. Piper and her abductor in which he stated that the kidnappers were meticulous in not traversing state lines so as to avoid the death penalty under federal law. While this reference to the death penalty is a mistaken one, *see* 18 U.S.C. § 1201(c), the kidnappers' concern implies they followed a wholly intrastate route from the Piper home to the park. Appellants also introduced evidence that at the time of the kidnapping, a large sign over a tavern near the Minnesota/Wisconsin state line carried a legend indicating entry into the State of Wisconsin.

Without detracting in any way from Mrs. Piper's perceptiveness and veracity, because of her circumstances during the abduction —blindfolded, compelled to lie on the backseat of an automobile for several hours, undoubtedly terrified—any court must hesitate in relying predominantly upon the victim's senses, other than sight, as providing proof beyond a reasonable doubt of the essential interstate transportation element

11. An FBI witness testified during trial that at the time of the reenactment, the Bureau was not concerned with the interstate aspect of the crime. If no interstate transportation could be shown, the kidnappers could be prosecuted under the Minnesota state law. However, the state statute of limitations barred prosecution after three years. *See* Minn.Stat.Ann. §§ 609.-25 (1964), 628.26 (Supp.1979).

of this crime. However, the Government produced additional evidence tending to establish that the abductors took the interstate route.

First, the standard Minnesota state highway map shows only federal and state highways, so a jury could reasonably reject the notion the kidnappers travelled on county roads.[12] Further, from the testimony the jury could reasonably infer that the kidnappers would follow the route which would draw the least attention to them, i. e., the most travelled roads. That route, according to the FBI, is the one passing through Wisconsin. Secondly, as we understand it, other than the route passing through Wisconsin, only the route taking the Sandstone exit from Interstate 35 involves a stop and thereafter the crossing of railroad tracks and a wooden bridge enroute to Jay Cooke State Park. This Sandstone route appears longer and more indirect than an alternative route leaving Interstate Highway 35 at its next exit to the north, joining state highway 23 and driving through Askov, Minnesota. However, no stops, railroad crossings, or bridges are encountered on the Askov route. Thirdly, and particularly significantly, the male caller describing the location of Mrs. Piper to Rev. Hendrickson and Alice Codden identified the site of confinement as requiring southern travel on state highway 23 and an entrance into the park from the north. The caller said to Rev. Hendrickson:

"You go south of Fond du Lac about one mile. There is a high voltage power line that crosses the road, and a little beyond the power line is an approach that turns to the right. * * * [I]t's as you are traveling on 23 from Duluth towards Minneapolis. * * * You go in a little ways in the approach. You call her name and she can hear you."

In the call to Alice Codden, the caller said:

"Twenty-two miles from Duluth, Minnesota. Highway 23. * * * There will be a rest spot there, and about one hundred feet is where the Piper woman is."

The route passing through the State of Wisconsin is a likely and usual way of reaching Jay Cooke State Park from the Minneapolis area. It is consistent with Mrs. Piper's description of her sensations on the abduction trip of July 27, 1972. In the telephone calls describing Mrs. Piper's location, the caller's directions advised entering the park from the north on highway 23, the final leg of a route from the Piper home which requires crossing into Wisconsin for a short distance. Finally, this route is the only one of the routes which calls for a sharp right turn onto an approach road, corresponding to the right turn Mrs. Piper described in her testimony. Reasonable inferences drawn from the evidence permit a finding, beyond a reasonable doubt, that the kidnappers crossed state boundaries.

Accordingly, we agree with the district court that the Government produced sufficient evidence supportive of Mrs. Piper's impressions to permit the jury to find that the kidnappers violated the federal kidnapping law by travelling interstate with their victim.

## IV. Motion to Reopen.

We now consider whether the trial court erred in denying appellants' motion to reopen to permit the jury to hear the testimony of Lynda Lee Billstrom. To aid our examination of the district court's ruling on the motion to reopen, we deem it important to review chronologies of, first, the efforts made to procure Ms. Billstrom's presence at trial and, second, the in-court proceedings relating to the proposed Billstrom testimony. We then describe Ms. Billstrom's probable testimony at trial, as given during the remand proceedings. Finally, with that background, we consider the merits of appellants' motion to reopen.

### A. Early Efforts to Subpoena Lynda Lee Billstrom.

During the second week of the trial, October 18–25, 1977, while the Government

12. The FBI found a Minnesota map in the Monte Carlo. The Monte Carlo had been stolen sometime before its use in the kidnapping. The automobile's owner testified that no maps were in the vehicle prior to the theft.

was still presenting its case, counsel for appellants discovered the 1974 Billstrom statement to the FBI. Bruce Hartigan, Larson's attorney, indicated that although appellants had received the entire FBI file, consisting of sixty-six volumes and incorporating 16,000 unindexed pages, during the first week of August 1977, the immense amount of information and work involved in the case prevented earlier discovery of the Billstrom statement. Aided by law students hired to assist them in examining the material, defense counsel initially checked the file for information concerning Larson and Callahan, and over the course of the case preparation they spent much time following various other leads. Although counsel acknowledge that early in their investigation they discovered references to Billstrom in 1972 reports contained in the FBI material, those references did not appear significant at the time.

On Thursday, October 20, the Government, for the most part, completed its case-in-chief, and on October 21 defense counsel instructed Gerald Seibel, a law student investigator, to serve Ms. Billstrom with a writ of habeas corpus *ad testificandum* at the Minnesota Correctional Facility for Women at Shakopee, Minnesota. Defense counsel assumed from information in the FBI reports that the institution housed Ms. Billstrom. On Friday afternoon, October 21, Seibel made a telephone call to the women's reformatory in Shakopee and learned that Ms. Billstrom was on probation or parole and could be located through the corrections department in St. Paul, Minnesota. Although unsuccessful in his attempt to contact Billstrom's probation officer on Friday afternoon, Seibel ascertained that the officer could be reached the following Monday. On Monday, October 24, the probation officer at first refused to disclose any information about Ms. Billstrom's location, but eventually furnished Seibel with her telephone number in Lake City, Minnesota.

Seibel drove to Lake City on Tuesday, October 25, and tried, unsuccessfully, to serve the subpoena. Seibel located the Billstrom residence but on three separate occasions received no response to his knocks. Later that day, Seibel solicited the local sheriff's assistance in attempting to serve Ms. Billstrom. Seibel and the process server had someone in the sheriff's office telephone the residence, but were told that Ms. Billstrom was not present, and received an indefinite answer as to her return. The local process server mentioned to Seibel that on other occasions he had experienced difficulty in attempting to serve process at the Billstrom residence. Wary that leaving notice of his presence and intention might induce Ms. Billstrom to go into hiding to avoid service of process, Seibel returned to Minneapolis at approximately 9:30 p. m. on Tuesday.

On Wednesday, October 26, Seibel contacted the United States Marshal's office and requested assistance in subpoenaing Ms. Billstrom. According to Seibel's testimony at the hearing on remand, the marshal indicated that he was "shorthanded that day" and commented, "Well, if you couldn't serve it, I can't serve it." Seibel informed the defense attorneys of his actions on Wednesday afternoon. Between Wednesday afternoon, October 26, and Friday afternoon, October 28, no attempts were made to subpoena Ms. Billstrom.

After a colloquy between counsel regarding the effort to serve Ms. Billstrom, but prior to the convening of court at 9:30 a. m., Friday, October 28, 1977, the day all parties rested, the trial judge inquired of U.S. Marshal Redpath whether he had an available officer to attempt service. The marshal replied, "[W]e have one that can make an endeavor." The U.S. Marshal received the subpoena from Mr. Seibel around noon on Friday, October 28, and served Ms. Billstrom that afternoon. In explaining the delay in delivering the subpoena to the marshal that Friday, Seibel stated that the subpoena had been left at the Minneapolis office—the trial was held in St. Paul—and that Seibel himself could not immediately provide the marshal with the subpoena because he remained at the courthouse in St. Paul testifying as a witness until the noon recess.

Unaware that service had been effected upon Ms. Billstrom, the defense rested its case on Friday afternoon, October 28. In explaining the defense decision to rest without ascertaining the success or failure of service on Ms. Billstrom, attorney Hartigan testified at the remand hearing as follows:

I was convinced that if this person wanted to avoid service, she was going to avoid service and there was no way they were going to get service. This girl was—she wasn't a Sunday school kid. I mean I knew she had a record. And I was convinced that she wasn't going to be served, and quite frankly there is really no provision in the rules of criminal procedure for reserving the right to reopen that I know of.

Candace De Grazia, a Winona, Minnesota, attorney, testified at the remand hearing that she received a telephone call about the subpoena from Ms. Billstrom on Friday afternoon, October 28. She then telephoned Larson's attorney, Bruce Hartigan. Mr. Hartigan returned her call on Saturday, and Ms. De Grazia informed him that she was Ms. Billstrom's attorney and that Ms. Billstrom had been served with a subpoena. Hartigan told De Grazia that he would send an investigator to Winona that day, Saturday, October 29, with statements Ms. Billstrom had previously given to the FBI. He requested that Ms. De Grazia review these statements with her client.

On Sunday, October 30, De Grazia called and informed Hartigan that she had reviewed the documents with her client, that Ms. Billstrom's statements to the FBI were substantially accurate, and that Ms. Billstrom would testify to those things that were not privileged under the fifth amendment. Hartigan requested that Ms. De Grazia bring Ms. Billstrom to the St. Paul courthouse at 9:00 Monday morning, October 31. He then telephoned the trial judge and informed him of the situation, advising that witness Billstrom would be available at 9:00 Monday morning. Hartigan also called the United States Attorney, Thor Anderson, and repeated the message he had just relayed to the district judge.

### B. In-Court Proceedings.

During a Thursday afternoon recess on October 27, 1977, appellants' counsel brought the matter of Lynda Lee Billstrom to the attention of the district court. At that time, Mr. Ronald Meshbesher, counsel for Callahan, explained that defense efforts to contact Ms. Billstrom had repeatedly failed.[13] Consequently, Mr. Meshbesher indicated that he desired to introduce a statement made by Ms. Billstrom to the FBI in August 1974 as admissible testimony of an unavailable witness. The trial judge informed the parties that he would hear arguments the following day as to the admissibility of the Billstrom statement.

On Friday morning, October 28, 1977, the final day of trial testimony, the defense, relying on Fed.R.Evid. 804(a)(5) and (b)(3), attempted to introduce into evidence the 1974 Billstrom declaration to the FBI as a statement made against penal interest by an unavailable witness. In opposing the introduction of the 1974 statement into evidence, the Government asserted that the statement did not constitute any kind of admission against Ms. Billstrom's interests and that she was available to appear at trial. At approximately 9:30 a. m., Friday, October 28, the district court informed the parties that he would review the 1974 Billstrom statement, and, at about 1:30 p. m., just before the opening of the afternoon session, the court announced its ruling denying the admission of the statement into evidence.

13. Meshbesher related that:

We have tried to serve [Ms. Billstrom] with process at the place we think she lives. We had a man cooped up at her house for seven hours the other day in a suburb of Winona. He can't get in. * * * He called the deputy sheriff for help. There is no way he could get in. We don't know if she is there or not. It's the only posted address we have for her.

We asked the marshal to serve the subpoena. The marshal says, "Forget about it. We are not serving your subpoenas. We don't have the manpower to go down there and chase a witness."

During that Friday afternoon all parties rested. Appellants' counsel did not know whether the U.S. Marshal would succeed in serving a subpoena upon Ms. Billstrom that afternoon, and they did not reserve the right to reopen the case in the event she was served. A discussion over instructions and the allocation of time for closing arguments by counsel consumed the remainder of the court day. The court scheduled jury arguments to begin on Monday, October 31, at 9:30 a. m.

Acting on knowledge gained from Ms. Billstrom's attorney during the intervening weekend that the marshal had subpoenaed Ms. Billstrom on Friday afternoon, counsel for Callahan and Larson moved at the earliest opportunity the next Monday morning to reopen their case to offer the testimony of Lynda Lee Billstrom. The court denied the motion.

C. *Statements of Lynda Lee Billstrom.*

In light of the Government's claim in its remand letter that Ms. Billstrom attested "to a far more innocuous story" at the remand hearing "than what appeared in her [1974] FBI statements," we substantially confine our analysis to the sworn testimony offered by Ms. Billstrom at the remand proceeding.

Ms. Billstrom recalled attending four meetings in July 1972, all prior to the Piper kidnapping, held in the Minneapolis-St. Paul area. She also testified about events occurring during the days of and after the kidnapping.

Ms. Billstrom stated that although others participated in some of the meetings, Robert (Bob) Billstrom (Lynda Lee Billstrom's common law husband), Ronald Alger, a Mr. Taylor, and "Art" attended all four meetings. At one of the meetings, Ms. Billstrom overheard the name Piper mentioned in the context of a discussion about a kidnap plan. Only at that meeting did Ms. Billstrom hear the Piper name mentioned.

Ms. Billstrom characterized the meetings' participants as "protective" about their plan. She recalls observing some photographs, one of which she subsequently described as similar to a photograph of the front entrance gate to the Piper residence shown to her by the FBI in 1974. Ms. Billstrom noticed hand-drawn maps and saw guns all around. In addition, she saw a powder blue sweater with a "St. Olaf" designation at one of the July 1972 meetings. The Billstrom group considered that somebody should go camping "to check the situation out."

Over the course of the four meetings, the group discussed two vehicles that would be employed in the kidnapping: a red Mustang owned by Lynda Lee and Bob Billstrom—which contained tape, gauze, a chain, and a two-way radio—and a blue Vega, to be used as a stakeout vehicle.

Ms. Billstrom commented that Ron Alger and Bob Billstrom frequented the Sportsman's Bar in north Minneapolis. She also stated that Bob Billstrom smoked (but could neither identify the cigarette brands nor whether he smoked menthol cigarettes), had purchased a Royal typewriter prior to the kidnapping,[14] and knew a man in Chicago called "Alabama."

Some two weeks before the kidnapping of Mrs. Piper, Ms. Billstrom states that she and Bob Billstrom went on an overnight camping trip to Jay Cooke State Park. As a point of reference in the park, Ms. Billstrom recalls observing a powerline while on the camping trip.

On July 27, 1972, Ms. Billstrom, Bob Billstrom, and Bob's stepson, Michael Billstrom, checked into a Prescott, Wisconsin, motel. At the motel Bob Billstrom telephoned Ron Alger and received a return phone call from Alger.[15] Although Bob Billstrom left soon after registering, Ms. Billstrom remained at the motel until the next day when Linda Alger picked her up

---

14. During the 1974 interviews with Ms. Billstrom, the FBI stated the typeface on the ransom note probably came from a Royal typewriter.

15. The Government confirms that a record exists of a telephone call from the Alger residence to a motel in Prescott, Wisconsin, on July 28, 1972.

and transported her to the Alger residence. Ms. Billstrom claims the purpose of the motel stay "was to provide an alibi for Bob Billstrom." Ms. Billstrom next saw Bob Billstrom on Saturday, July 29, and that evening she attended a party with him and eight or nine other persons celebrating the successful completion of a "job."

Ms. Billstrom related that during one of the meetings she saw Ron Alger wearing a pair of brown slacks resembling pants shown to her by the FBI, which were those given to Mrs. Piper by her abductor in Jay Cooke State Park. Ms. Billstrom remarked that, following an FBI search of Ron Alger's home after the kidnapping, Alger disposed of some articles, including clothing and a sawed-off shotgun remaining in his car, by throwing them into the Mississippi River. She also testified that an FBI artist's conception of a ransom money passer shown to her in 1974 looked like Ron Alger.[16]

Ms. Billstrom testified that she and Bob Billstrom fled Minnesota after July 29, 1972, and travelled to South Dakota and Utah. During that period Bob Billstrom spent a large amount of money. Eventually, after her flight from Minnesota, Ms. Billstrom was apprehended and imprisoned. Apparently pursuant to an oral agreement among members of the Billstrom group made around July 29, 1972, she received money periodically from Linda Alger.

On cross-examination during the remand hearing, Ms. Billstrom admitted that she possessed no firsthand knowledge about the Piper kidnapping and that in 1972 she told the FBI Bob Billstrom had not participated in the crime. Ms. Billstrom refused to discuss the ransom money on fifth amendment grounds and admitted lying to the FBI about the money. She further stated that both Bob Billstrom and Charles Van Deusen, another participant in the planning sessions, had died since the kidnapping.

In explanation of Ms. Billstrom's reluctance to testify, defense counsel advised the district court that the Government had warned Ms. Billstrom before her remand hearing appearance that she would be prosecuted for any false statements she had made during previous FBI interviews. The Government did not deny that explanation. Assuming the truth of the defense representation, the existence of such a warning to Ms. Billstrom tends to enhance her credibility on matters about which she did testify.

The district court's closing inquiry to Ms. Billstrom is also of some significance:

Well, I got the impression that maybe you were giving answers to their [FBI] questions, you being in jail, because you wanted to accommodate them, is that a proper inference to draw from what you were saying?

Ms. Billstrom responded, "No."[17]

**D. Significance of Ms. Billstrom's Testimony.**

In the context of this case, the importance of the Billstrom testimony lies in its ability to link many unexplained clues and bits of evidence introduced at trial circumstantially to persons other than appellants. In doing so, the testimony tends to blunt the probative force of the Government's case against Callahan and Larson, which rested primarily on circumstantial evidence. The contrast that can be drawn between various aspects of the Government's presentation against Callahan and Larson and the Billstrom testimony, with its considerable correlations to evidence adduced at trial, might have significantly undercut the Government's case as viewed by a jury. We note the following as examples.

**1. Planning.**

The Government relied on evidence provided by former convicts to show that be-

---

16. Ms. Billstrom indicated that another FBI composite sketch could have been a poor artist's conception of Bob Billstrom.

17. If permitted to testify, Ms. Billstrom's credibility would be for the jury. On the record presented to us, we cannot say that her testimony is beyond reasonable belief. In fact, as noted in the text, many of her statements are consistent with other evidence in the record.

fore the kidnapping Callahan had sought advice about how to launder $20 bills, appellants possessed handcuffs, and Larson had inquired about Harry Piper. 442 F.Supp. at 1230–31, nos. 3, 7, 8.

In comparison, Ms. Billstrom's testimony outlines the detailed planning of a crime which included mention of the Piper name, utilization of maps and diagrams, availability of firearms, examination of photographs of the crime scene, and reconnaissance of a campsite at Jay Cooke State Park.

### 2. *Vehicles and Equipment.*

The Government linked Larson to the green Monte Carlo employed by the kidnappers by way of a prekidnapping eyewitness identification (Frank Hetman's identification of Donald Larson by comparison to a newspaper photograph) and a fingerprint on a scrap of paper. Callahan was linked to the same vehicle through a hair strand. 442 F.Supp. at 1230, nos. 1 and 2. The Government failed to show any connection of Callahan and Larson with other vehicles.

The Billstrom testimony discloses that the Billstrom group had access to a blue Vega which they intended to use as a stakeout vehicle. At trial, witness Janet Selstad testified that she observed a blue Vega near the Piper home on the day before and the day of the kidnapping.

Robert and Lynda Lee Billstrom owned a red Mustang which, in July 1972, contained masking tape, gauze, a chain, and a two-way radio. An FBI report indicated that a red Mustang had been observed in Jay Cooke State Park during the kidnapping, on July 28, 1972. Before he disappeared on Friday evening, July 28, 1972, a kidnapper chained Mrs. Piper to a tree. And at the first stop of the ransom delivery, the kidnappers left a radio transmitter and a written direction that Harry Piper place the transmitter in his car so that Piper's occupancy of the vehicle could be monitored for sound through a radio receiver.

In addition, Bob Billstrom had purchased a used Royal typewriter prior to the kidnapping. The ransom note and the delivery instructions to Harry Piper may have been typed on such a machine. The Government's inability to connect appellants to the possession of a chain or to the use of a red Mustang, blue Vega, or two-way radio by no means destroys its case. However, the Billstrom testimony linking certain individuals with vehicles and equipment brought out at trial as being items used in the kidnapping seems to possess probative value equally significant as some circumstantial evidence offered by the Government to connect appellants to the crime. Ms. Billstrom's testimony linking the Billstrom group to these items used in the kidnapping, which other witnesses independently mentioned at trial, would serve to weaken the Government's circumstantial case against Larson and Callahan.

### 3. *Artist's Conceptions.*

The Government's reliance upon indirect identification evidence, *i. e.*, that FBI composite sketches of suspects looked like Callahan, 442 F.Supp. at 1230, nos. 5 and 6, would have been greatly weakened by Ms. Billstrom's testimony identifying one of the sketches as strongly resembling Ronald Alger, a member of the Billstrom group, and another as a poor likeness of Bob Billstrom.

### 4. *Identification of the Billstrom Group.*

We have noted that Ms. Billstrom claimed an artist's conception of a kidnap suspect looked like Ron Alger, *see supra* at 773, and that she testified regarding Alger's suspicious conduct after the time of the kidnapping, participation in the July 1972 meetings, and possession of brown trousers similar to those recovered from Mrs. Piper following her rescue. *See supra* at 772, 773. At trial, Government witness Carl Miller testified that during an FBI interview he had selected a photograph of Ron Alger from a photospread as resembling the person he observed the night of October 28, 1972, near a ransom instruction pickup point.

The record further shows that Government witness John Cardenas, a clerk in a men's clothing store, received a $20 ransom

bill in 1974 from a man whom he later identified as Gerald Alger.[18]

Ms. Billstrom mentioned that Art, a member of the Billstrom group, wore a diamond horseshoe ring on the little finger of his left hand.[19] Elaine Burfiend, a bank teller in Rochester, Minnesota, described the man passing ransom money in November 1972 as wearing an onyx-like ring with a diamond in the center on the little finger of his *right* hand.[20] Ms. Burfiend also observed a blood clot under the left thumb of this person. In its closing argument, the Government contended that the injured thumb represented a hazard of the trade of carpentry, pointing to Callahan who worked as a cabinetmaker, and suggested that Callahan passed the ransom money in Rochester. That argument might have carried less weight with the jury if it had heard Ms. Billstrom's reference to Art's diamond ring. Although perhaps not highly significant, the mention of a diamond ring in Ms. Billstrom's story, in conjunction with Ms. Burfiend's identification testimony, would support a jury inference that someone other than Callahan passed ransom money in Rochester—perhaps Art from the Billstrom group.

At trial, Mrs. Piper testified that her captor in the park referred to himself as "Alabama." The Government failed to link either appellant to the name "Alabama." However, according to Ms. Billstrom, Bob Billstrom knew someone called "Alabama" residing in Chicago. In addition, certain articles discovered at the site of Mrs. Piper's captivity—a wine bottle and matchbook cover—apparently originated in Chicago.

As part of the ransom delivery, the kidnappers instructed Mr. Piper to make two calls from the Sportsman's Bar in Minneapolis. The Government did not show that appellants had any familiarity with that bar. Ms. Billstrom reported that Bob Billstrom and Ron Alger frequented the establishment.

Finally, we offer the following observation. The complicated manner of the ransom delivery—involving several automobiles, possible monitoring by radio transmission, frequent stops, and the removal of the ransom money at the very point timed telephone signals were being relayed—together with the fact that at least one kidnapper remained with Mrs. Piper in the park until Friday night—suggests the participation of more than two individuals in the crime. This does not, of course, vindicate Callahan and Larson, but the performance of those tasks does seem more plausible as part of a group operation.[21]

### 5. *The St. Olaf Sweater.*

The Government sought to link Donald Larson to the crime through the testimony of a former convict, John Dineen, who stated that he saw Larson wearing a blue St. Olaf sweater when Larson visited an inmate at a Minnesota prison before the kidnapping. 442 F.Supp. at 1230, no. 4. When shown the sweater the kidnapper gave to Mrs. Piper at the park, Dineen could not say it was the same garment he had seen on Larson during the prison visit, explaining, "I'm not saying it's that exact sweater. * * I can't exactly say that it was that sweater. All I know it was St. Olaf College."

Ms. Billstrom states that she saw a powder blue St. Olaf sweater on a member of the Billstrom group during one of the July 1972 meetings, but also did not recall it as identical to the sweater introduced into evidence in this case as displayed to her by way of a photograph.

---

18. The record does not specify Gerald Alger's relationship to Ron Alger, but Ms. Billstrom in her 1974 statements to the FBI, indicated that Ron Alger had several brothers.

19. In the 1974 statement to the FBI, Ms. Billstrom also stated that Art had been passing ransom money in Minneapolis and Rochester, Minnesota.

20. Regardless of the description variance noted in the text relating to left and right hands, a jury hearing the Billstrom testimony might draw an inference that someone other than Callahan had transferred ransom money in Rochester, Minnesota.

21. Ms. Billstrom did not know, nor had she ever seen, Callahan or Larson.

In substance, John Dineen and Lynda Lee Billstrom each testified about a blue St. Olaf sweater, but neither could say it was the same sweater given to Mrs. Piper by the kidnappers. The Government's sweater evidence, then, appears to be of no greater probative value than that which would have been provided by the Billstrom testimony. In any event, it seems likely that the presentation of the Billstrom testimony regarding a St. Olaf sweater would, to some extent, have eroded the strength of the inference possibly drawn from Dineen's testimony that during the kidnapping Mrs. Piper had worn a sweater once possessed by Larson.

6. *Summary.*

The overall value of Ms. Billstrom's testimony to the defense rests in its possible effect upon the jury of undermining the inferences of guilt against Callahan and Larson. The Billstrom evidence demonstrates that some of the very clues and leads uncovered in the FBI investigation of the kidnapping tending to implicate appellants also point to others, and that other bits of evidence developed during trial but never connected to appellants can be linked to others through the Billstrom testimony.

E. *The Government's Rebuttal.*

In its remand letter, the Government offered the following rebuttal to the Billstrom testimony:

1) An FBI agent would testify that in November 1972, Ms. Billstrom denied that Bob Billstrom participated in the kidnapping.

2) Ron Alger would testify that neither he nor other Billstrom group members planned or participated in the Piper kidnapping, and that he was working during the period of the crime. Alger's employer would state that Ron Alger worked on a job on July 27 and 28, 1972, but was fired on July 28, 1972.

3) Michael Billstrom would deny having stayed with Lynda Lee and Bob Billstrom in a Prescott, Wisconsin, motel in July 1972.

4) Linda Alger would state that Ron Alger lived with her the week of July 27, 1972, during which he worked each day and returned home every night.

Apparently based on the Government's remand letter, the district court indicated that "the inferences from [Ms. Billstrom's] testimony could have been substantially refuted by evidence available to the government in rebuttal." *United States v. Callahan*, 455 F.Supp. 524, 527 (D.Minn.1978). Assuming for purposes of this discussion that the Government could procure the testimony outlined in its remand letter, we nonetheless do not agree with the district court for several reasons.

First, on-the-record identifications challenge Ron Alger's personal denials, and, in any event, the question of his credibility would be for the jury. In addition, Ron Alger's admitted telephone call to the motel in Prescott, Wisconsin, partially confirms Ms. Billstrom's statement that she and Bob Billstrom occupied a room at that motel for alibi purposes. That call also undercuts the inference possibly drawn from the proposed Michael Billstrom testimony that Bob Billstrom did not stay at the Prescott motel in July 1972.

In addition, Alger's proposed alibi defense does not account for his activities on the night of July 28, 1972, when the kidnappers made the ransom run—the Government's rebuttal evidence shows that Ronald Alger left his job during working hours on July 28—nor does it eliminate him either as a planner of the crime or as a ransom money passer months later.

Finally, the jury might have rejected the Ron Alger alibi evidence that would be derived from Linda Alger's proposed testimony in the same way it apparently rejected Callahan's alibi as supported by his wife and daughter.

In its remand letter the Government also referred to other rebuttal testimony it might have produced against appellants' case if the defense had been allowed to reopen on Monday, October 31, 1977. That evidence would not have materially strengthened the Government's case. Al-

though the Government had released its witnesses the previous Friday, the remand letter indicates that the released witnesses were readily available.

Notwithstanding the Government's proposed rebuttal evidence, we think the effect of the Billstrom testimony to weaken the prosecution's circumstantial evidence linking appellants to the kidnapping remains substantially intact.

### F. Merits of the Denial of Appellants' Motion to Reopen.

As we have indicated, the defense moved to reopen its case on Monday morning, October 31, 1977, to present the testimony of Lynda Lee Billstrom. The prosecution and the trial court were familiar with the substance of her testimony because of a prior attempt by appellants to introduce a statement she had given to the FBI in 1974. Although all parties had rested the previous Friday, October 28, the motion preceded closing arguments and instructions to the jury.

#### 1. The District Court's Denial of the Motion.

As described *supra* at 764, on the initial appeal of Callahan and Larson, this court remanded the cause to the district court with directions to make a supplemental record concerning appellants' efforts to obtain Billstrom as a witness and the possibility appellants suffered prejudice by being foreclosed from introducing Billstrom's testimony. On remand, the district court reaffirmed its decision at trial denying Callahan and Larson's motion to reopen. *United States v. Callahan*, 455 F.Supp. 524 (D.Minn.1978).

In support of its ruling on remand, the district court noted that defense counsel had been furnished all FBI reports, including copies of statements made by Lynda Lee Billstrom, several months before trial. The court commented:

> Counsel for defendants, if they valued Mrs. Billstrom's possible testimony, should have interviewed her early on during the approximately four months they

had her F.B.I. statements; and, if they found her potential testimony helpful to their case, they should have subpoenaed her to testify at least one or two days before resting. They make no reasonable excuse for not doing so. [*Id.* at 526–27.]

The court also noted the following:

> At the time defendants rested, both of defendants' counsel knew a subpoena was in the hands of the United States Marshal for service upon Lynda Burt Billstrom. Notwithstanding this, defendants did not reserve the right to reopen if service was made. This was likely a tactical decision on their part[.]
>
> When defendants rested, government counsel made his responsive tactical decision—to immediately rest. He did so— abandoning a prepared plan of rebuttal— and released all of his witnesses. [*Id.* at 525–26.]

The district court did not consider the Billstrom testimony of much significance, observing:

> The value of Mrs. Billstrom's possible testimony would have been substantially discredited, and probably outweighed, by the potential rebuttal evidence available to the government. It is not reasonable to believe therefore that she could be viewed as a likely helpful witness for defendants.

> \* \* \* \* \* \*

> On the whole record, the court is satisfied it was a proper exercise of its discretion to deny the motion to reopen. [*Id.* at 526, 527.]

The district court provided several additional reasons for its denial of the motion to reopen in its immediate post-trial order:

> The prosecution would have been prejudiced by permitting a reopening. The evidence, if admissible, would have carried a distorted importance. [*United States v. Callahan*, 442 F.Supp. 1213, 1224 (D.Minn.1978).]
>
> [Ms. Billstrom's testimony] was one of several alleged kidnap conspiracies and the people she claims were the kidnappers were several among dozens of suspects. [*Id.* at 1225.]

### 2. The Applicable Legal Standards.

■ A motion to reopen for the submission of additional testimony is addressed to the discretion of the trial court. 6A *Moore's Federal Practice* ¶ 59.04[13], at 31; *United States v. Levin*, 443 F.2d 1101, 1108 (8th Cir.), *cert. denied*, 404 U.S. 944, 92 S.Ct. 297, 30 L.Ed.2d 260 (1971). In passing on the motion a court should consider a number of pertinent factors: the timeliness of the motion; the character of the additional testimony; and the effect of granting the motion.

■ The party moving to reopen must provide a reasonable explanation for its failure to present the additional evidence during its case-in-chief. *United States v. Bayer*, 331 U.S. 532, 538–39, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947). Motions to reopen have been granted after both parties have rested. *United States v. Barker*, 542 F.2d 479 (8th Cir. 1976).

■ The evidence proffered on the motion to reopen should be in such condition that it can properly be placed before the jury, that is, relevant, admissible, and not technically deficient. *See United States v. Bayer*, 331 U.S. at 537–38, 67 S.Ct. 1394; *United States v. Young*, 488 F.2d 1211, 1213–14 (8th Cir. 1973).

The additional testimony should assist the jury in ascertaining the guilt or innocence of the accused. *United States v. Serio*, 440 F.2d 827, 831 (6th Cir.), *cert. denied*, 404 U.S. 838, 92 S.Ct. 129, 30 L.Ed.2d 71 (1971); *United States v. Levin*, 443 F.2d at 1108. *See United States v. Keller*, 523 F.2d 1009, 1011–12 (9th Cir. 1975) (had the testimony offered by defendants been placed before the jury, it cannot be said the jury's verdict would have been the same; consequently, the court's refusal to recall a witness deprived defendants of an essential part of their defense).

■ In addition, the belated receipt of such testimony should not imbue the evidence with distorted importance, prejudice the presentation of an opposing party's case, or preclude an adversary from having an adequate opportunity to meet the additional evidence offered. *See Lucas v. United States*, 343 F.2d 1, 3 (8th Cir.), *cert. denied*, 382 U.S. 862, 86 S.Ct. 125, 15 L.Ed.2d 100 (1965).

■ The district court's denial of Callahan and Larson's motion to reopen can be interfered with only by a clear showing of abuse of discretion. We now examine the trial court's exercise of discretion in denying appellants' motion to reopen in light of the aforementioned considerations.

### 3. Analysis.

■ We have already noted appellants' efforts to contact Ms. Billstrom by first dispatching an investigator, then a sheriff, and finally a marshal to serve her with a subpoena. *See supra* at 769–770. Based on the record, appellants cannot be said to have been dilatory in their efforts to subpoena Ms. Billstrom. In light both of appellants' difficulties in communicating with Ms. Billstrom and their not knowing whether the U.S. Marshal had served her, defense counsel might reasonably have concluded on Friday afternoon, October 28, 1977, that Ms. Billstrom would be unavailable as a defense witness. It cannot be said that by resting on that Friday afternoon appellants waived their opportunity to introduce the Billstrom testimony.

■ By Sunday, October 30, 1977, defense counsel were informed of Ms. Billstrom's availability and her willingness to confirm a considerable portion of the 1974 statement to the FBI. *See supra* at 771. Even if resting on Friday afternoon amounted to a tactical decision by defense counsel, the developments over the weekend—the subpoena of Ms. Billstrom and her substantial confirmation of the 1974 statement—changed the situation sufficiently that appellants were entitled to reconsider their decision. Appellants provided a reasonable excuse for the untimely offer of the Billstrom testimony and, on this ground, should not have been precluded from reopening their case.

■ We are unaware of any rule that obligates a defense counsel to locate and

subpoena a witness before the Government completes its case or that requires counsel to interview a witness before seeking a subpoena, when counsel is in possession of a signed statement which the witness has given to the FBI. Reasonable diligence appears to be all that is required. Thus, we cannot agree with the dissent's suggestion, at 782–783, that defense counsel's actions in this case in failing to earlier interview or subpoena Ms. Billstrom justified rejection of the Billstrom testimony when tendered.

At the time of the motion to reopen, appellants were prepared to tender Ms. Billstrom as a witness—she appeared at the courthouse on Monday morning, October 31, 1977—and her testimony, as we have reviewed it in this opinion, seems highly relevant.

■ Because of the exculpatory potential of the Billstrom testimony—the fact that a significant number of correlations exist between it and evidence adduced at trial—upon thorough scrutiny of the entire record, we believe that such evidence would have weakened the force of the Government's case linking appellants to the Piper kidnapping and would have enhanced appellants' defense.

Moreover, we do not believe a reopening of the case would have prejudiced the Government. The Billstrom testimony would not have carried a distorted importance merely by being introduced after a reopening. First of all, since neither closing arguments nor jury instructions had yet been delivered, the Billstrom testimony would have been heard in the orderly flow, with perhaps an intervening continuance, of the defense testimony. But even assuming that the testimony might have derived undue emphasis from its appearance subsequent to all parties resting, a cautionary

instruction by the trial judge might have remedied that potential problem.

So far as we can ascertain from the record, all of the witnesses the Government intended to call in rebuttal to the Billstrom testimony, except for one FBI agent, resided in the Minneapolis area and would have been available on Monday, October 31, 1977, or soon thereafter.[22] Given the location of the witnesses and the Government's presentation on remand suggesting it could have produced them, a short continuance might have been sufficient to enable the Government to proceed with rebuttal at the conclusion of the Billstrom testimony.[23]

The Government resisted the motion to reopen on grounds of prejudice. Although the district court initially found that the Government would have been prejudiced by a reopening, 442 F.Supp. at 1224, on remand the court made no such finding of prejudice, 455 F.Supp. at 525–27. The record on remand refutes the Government's claim of prejudice.

Finally, we are mindful of the district court's opinion that the introduction of the Billstrom testimony would only have wasted time and resulted in confusing the issues and misleading the jury, diverting a trial about the guilt or innocence of Callahan and Larson into an exposition of many other leads investigated by the FBI. *Callahan v. United States*, 442 F.Supp. at 1224, 1225. Although recognizing the relevance of that concern in this case, we must observe that, apart from Ms. Billstrom's testimony, the record is replete with clues and leads followed by the FBI that did not implicate Callahan and Larson. Moreover, we are not here concerned with the testimony of many additional witnesses, but of one more defense witness—Ms. Billstrom.

Considering the record as a whole, we find no valid reason to justify a denial of

**22.** On Sunday, October 30, 1977, Bruce Hartigan, counsel for Larson, informed the Government attorney, Thor Anderson, of his intention to move for reopening.

**23.** In its remand letter the Government asserted:

Had the defense been allowed to reopen Monday, October 31, 1977, for Linda Burt's [Lynda Lee Billstrom's] testimony and had the government been able to get a continuance of a day or two to put together a rebuttal case, the following witnesses would have been called to rebut her story[.]

the defense motion to reopen to present Ms. Billstrom's testimony. We therefore conclude the ruling which denied the defense the opportunity to introduce that testimony constituted trial error and an abuse of the trial court's discretion which substantially prejudiced Larson and Callahan. Accordingly, in the interests of justice we order a new trial.

### V. *Other Alleged Errors.*

We have examined the remaining alleged errors advanced on this appeal by Callahan and Larson. In light of our decision to provide appellants with a retrial, we deem it unnecessary to decide issues unlikely to reoccur upon retrial, and we determine that other allegations are without merit.

We do not resolve contentions on appeal relating to the unauthorized jury experiments, the alleged *ex parte* communication with the jury, and the district court's refusal to conduct an evidentiary hearing to investigate the prejudicial impact of various incidents involving the jury. In addition, we do not decide the issue of whether the Government improperly failed to disclose a spelling test given to Callahan. *See supra* at 762, nos. 6–9.

 We find no merit in appellants' allegations, designated nos. 3 and 4, *supra* at 762, relating to the district court's refusing to admit into evidence the Billstrom statement made to the FBI and testimony of alleged leniency offers made to various felons, not called as witnesses, as inducements to testify against Callahan and Larson. We also reject appellants' claim that the trial court erred in declining to instruct the jury regarding a defense contention that the Government had fabricated its case against appellants. *See supra* at 762, no. 4. Further, the district court committed no error in its evidentiary rulings concerning prosecution witness John Dineen. *See supra* at 762, no. 5. The district court rejected these contentions for good and sufficient reasons set forth in its opinion denying appellants a new trial. *United States v. Callahan*, 442 F.Supp. 1213 (D.Minn.1978).

We add a final comment pertinent to defense contentions that the Government fabricated evidence against appellants and suppressed exculpatory evidence. In our view, the Government acted with the utmost fairness in the investigation preceding, and in the conduct of, this trial. Indeed, the very identity defense employed by Callahan and Larson, that other persons were the kidnappers, resulted from information contained in the voluminous product of the FBI kidnap investigation, delivered to appellants' counsel about three months prior to trial. The record discloses nothing short of extreme diligence on the part of the Government in attempting to unriddle this most difficult case. Contentions of misconduct or wrongful conduct leveled against the FBI or Government counsel are utterly without foundation and worthy of disapprobation.

Reversed and remanded.

STEPHENSON, Circuit Judge, dissenting.

I respectfully dissent. The record demonstrates that the able and experienced trial judge did not abuse his discretion in denying the motion to reopen after the parties had rested and just before final arguments were to begin.

Sound reasons for denial of the motion to reopen are fully set out in the trial court's memorandum and order denying motions for judgment of acquittal or new trial. *See United States v. Callahan*, 442 F.Supp. 1213, 1223–25 (D.Minn.1978).[1] In substance the trial court found that (1) the motion to reopen was untimely under the circumstances; (2) the prosecution would have been prejudiced by a reopening; and (3) even if defendants had been permitted to

---

1. The discussion under "Statement of Abortive Witness Burt" is included because it summarizes the general nature of the proffered testimony and the trial court's view that the probative value of the proposed testimony by Witness Burt (Ms. Billstrom) was substantially outweighed by the danger of confusion of the issues, unfair prejudice and misleading the jury. *See* Fed.R.Evid. 403.

reopen it was questionable whether Ms. Burt's (Billstrom's) testimony would have been admissible in light of Fed.R.Evid. 403. While all of the foregoing factors were appropriately considered by the trial court, I have little difficulty in affirming the trial court's action solely on the basis that the motion was untimely under the circumstances in the case.

Appellants were furnished the FBI files containing Billstrom's statements several months before trial. At the remand hearing counsel for appellants admitted Billstrom's statements came to their attention about a week after the trial commenced and they first took steps to locate her a week before they rested their defense. However, the original record discloses that the first time counsel for appellants indicated to the court that they had any interest in Billstrom's testimony was during the afternoon recess on Thursday, the day before resting their case. At that time counsel advised the court that they were having difficulty serving Billstrom. *See* majority op. n. 13, *supra*. As a result counsel indicated that they desired to introduce Billstrom's FBI statements. The court set the matter for argument the following morning prior to opening the jury session and announced its decision not to admit the Billstrom statements just before the afternoon session. About one hour later the appellants rested. The Government rested without rebuttal. The jury was excused until Monday.

On Monday at approximately 9:15 a. m. appellants moved to reopen their case for the purpose of presenting the testimony of Ms. Billstrom. During the course of argument on the motion the court made inquiry of Deputy Marshal Redpath as to any prior requests for service of a subpoena. The marshal advised that he was not given a subpoena for service until Friday at 12:30 p. m. and service was completed in three hours.[2] The Government objected to the motion to reopen because defendants had knowledge of Billstrom's statements to the FBI for two months and rested without reservation, knowing full well that a subpoena for Billstrom had been delivered to the marshal for service; and for the further reason that the Government had abandoned plans for rebuttal when defendants rested and its rebuttal witnesses "are now scattered to the winds * * * and it does prejudice us."

An examination of the voluminous trial record reveals that appellants were represented by able and experienced counsel. I am in complete agreement with the trial court's observations:

> In this situation fairness required denial of the motion to reopen. Defense counsel were at fault for the situation in which they found themselves. The prosecution would have been prejudiced by permitting a reopening. The evidence, if admissible, would have carried a distorted importance. *United States v. Bayer*, 331 U.S. 532, 67 S.Ct. 1394, 1397, 91 L.Ed. 1654 (1947).
>
> Defense counsel knew early in the trial that the court would not receive the F.B.I. report of the Burt interview because it was hearsay, *supra*. Defense counsel should have had the Marshal serve her then instead of waiting until the last day. Had defense counsel advised the court and prosecutor on Friday,

2. The inquiry and answer were as follows:

THE COURT: Mr. Redpath, when were you asked to make service?

MARSHAL REDPATH: I believe it was Tuesday morning this investigator asked me if I couldn't make this service. I asked him when it was returnable. He said, "I don't know. I will get back to you." I said, "Right now I don't have any deputies available." At that time, Your Honor, we had the lockup full of prisoners out of Stillwater, and I had all the deputies available guarding them.

He never did get back or never got back with me until Friday morning when the matter was brought up before Your Honor, and I saw him at about 9:30. He said, "Well, I don't have the subpoena, it's coming." And at 12:30 I received the subpoena from Mr. Seibel.

THE COURT: That's last Friday?

MARSHAL REDPATH: Last Friday.

THE COURT: Then you or some other deputy—

MARSHAL REDPATH: I had a free deputy. He went down and effected service around 3:30 Friday afternoon.

October 28, that the witness had been subpoenaed and they intended to move for reopening on October 31, their motion might have reflected a good faith endeavor. Of course, knowing the Marshal was serving the subpoena, they should not have rested or they should have rested with reservation to reopen if process was served.

Even if defendants had been permitted to reopen, there still remained the question as to whether Ms. Burt's testimony would have been admissible in light of Fed.R.Evid. 403, a factor to be considered on a motion to reopen, *United States v. Young*, 488 F.2d 1211, 1214 (8th Cir. 1973). The same considerations discussed above in regard to the admissibility of Ms. Burt's statement are applicable here, i. e., the fact that hers was one of several alleged kidnap conspiracies and the people she claims were the kidnappers were several among dozens of suspects. These factors reduced substantially any probative worth her testimony might have possessed, making the denial to reopen a proper exercise of the court's discretion. *United States v. Webb*, 533 F.2d 391, 395 (8th Cir. 1976).

*United States v. Callahan, supra*, 442 F.Supp. at 1224–25.

After hearing the arguments on appeal we remanded to the district court for the limited purpose of supplementing the record with respect to the testimony of Ms. Burt (Billstrom) and to clarify the record concerning the effort to obtain Billstrom as a witness, and the circumstances on October 28, 1977, relating to defense counsel's failure to reserve the right to reopen, and proposed rebuttal evidence available to the Government at trial.[3]

The district court's supplemental findings on remand are found in *United States v. Callahan*, 455 F.Supp. 524 (D.Minn.1978). They are amply supported by the record and cannot be said to be clearly erroneous.

The district court found, inter alia:

At the time defendants rested, both of defendants' counsel knew a subpoena was in the hands of the United States Marshal for service upon Lynda Burt Billstrom. Notwithstanding this, defendants did not reserve the right to reopen if service was made. This was likely a tactical decision on their part. * * *

When defendants rested, government counsel made his responsive tactical decision—to immediately rest. He did so—abandoning a prepared plan of rebuttal—and released all of his witnesses.

These decisions, reflecting the considered professional judgment of the very competent counsel on each side, were made on Friday, October 28. * * *

* * * * * *

The value of Mrs. Billstrom's possible testimony would have been substantially discredited, and probably outweighed, by the potential rebuttal evidence available to the government. It is not reasonable to believe therefore that she could be viewed as a likely helpful witness for defendants. But if she were so viewed, defendants' counsel should have subpoenaed her long before the last afternoon of trial. She had not even been interviewed, and, contrary to defendants' assertion in briefs, she was readily available. She testified at the hearing (p. 127) that she was released from prison in March 1975 and stayed in Minnesota. In October 1977, during trial, she was at her home in Winona, Minnesota. She was on state parole at the time and her whereabouts was known to her parole officer as well as to Winona County sheriffs' officers. Her residence was served by a telephone. Although defendants' counsel would imply through the testimony of their office investigator that Mrs. Billstrom was avoiding service of process, there is no evidence to support this. She appeared to be anything but an unwilling witness at the remand hearing. The U.S. Marshal had no trouble finding and serving her in Winona within three hours of

---

3. Our remand also included clarification of the record with respect to appellants' claim of im-

proper communication by the marshal with the jury.

the time the subpoena was given him the last day of trial.

Counsel for defendants, if they valued Mrs. Billstrom's possible testimony, should have interviewed her early on during the approximately four months they had her F.B.I. statements; and, if they found her potential testimony helpful to their case, they should have subpoenaed her to testify at least one or two days before resting. They make no reasonable excuse for not doing so. * * *

It would have been for the jury to weigh and decide the worth of her testimony in the light of the government's rebuttal to it, but the relevancy of her testimony, its admissibility and the weight to be accorded it were not reached during trial because defendants did not tender it until three days after both sides had rested and just before jury arguments were to begin. Whether defense counsel's actions in not promptly interviewing and timely subpoenaing Mrs. Billstrom were the result of inadvertence or deliberate trial tactics, they in either case did not, and do not now, constitute sufficient grounds for reopening the case or granting a new trial.

On the whole record, the court is satisfied it was a proper exercise of its discretion to deny the motion to reopen. *See, e. g., United States v. Dossey,* 558 F.2d 1336, 1339 (8th Cir. 1977); *United States v. Webb,* 533 F.2d 391, 395 (8th Cir. 1976); *United States v. Aiken,* 373 F.2d 294, 300 (2d Cir. 1967) (factually on point).

*United States v. Callahan, supra,* 455 F.Supp. at 525–27.

I am in complete agreement with the trial court that on the whole record it was a proper exercise of its discretion to deny the motion to reopen. It appears to me that under the majority opinion trial court discretion is accorded little deference. *See United States v. Aiken,* 373 F.2d 294, 300 (2d Cir. 1967), where the district court was faced with a similar situation and denied the application to reopen, the court of appeals affirmed, holding such was not an abuse of discretion.

I am in accord with the majority's disposition of other errors reached in its opinion, appellants' claims numbered 1, 3, 4 and 5, except with reference to claim No. 1, wherein the majority agreed there was a submissible issue of guilt, although not a strong one. After reviewing the evidence I concur with the trial court's observation: "[T]he government presented a strong case for guilt as to each defendant albeit much of its evidence was circumstantial rather than direct. * * * This was a permissible verdict well supported by the evidence, and in my view, a proper verdict." *United States v. Callahan, supra,* 442 F.Supp. at 1231–32. For the trial court's full discussion on sufficiency of the evidence, *see id.* at 1228–32. The defendants were represented by able and experienced lawyers who conducted the defense with great vigor.

The majority did not reach claims numbered 6, 7, 8 and 9 in view of its action in ordering a new trial. I have considered these claims and find that the record fully supports the trial court's finding that they were not adequate grounds for a new trial. Claim 6 with respect to appellants' contention that the Government, by suppressing evidence that Callahan passed a spelling test containing some of the words misspelled in the ransom notes, denied appellants due process of law in not ordering a new trial is without merit. *See* district court's discussion at 442 F.Supp. 1226–28.

The district court's rejection of claims of juror misconduct in conducting experiments during the course of the trial is well founded (claim 7). The conduct did not reach the level of impropriety and in any event was not prejudicial. *See* district court's discussion at 442 F.Supp. 1225–26.

In claim 8 appellants contended that the district court violated appellants' right to be present at every stage of the trial when, without notice to appellants or their counsel, it communicated with the jury. In its original opinion at 442 F.Supp. 1226, the district court stated it did not communicate directly or indirectly with the jury except in the courtroom with all parties present.

Further, that on November 2 when the jury told the marshal it wanted to consult with the court, and the marshal telephoned the court at his home, the court told the marshal to tell the jurors if they wanted further instructions or counsel to communicate with him in writing the next morning when all parties would be present. No written request for further instructions was received. In our limited remand we noted that appellants apparently did not dispute the court's statement that there was no communication by the court, but appeared to assert that a bailiff or marshal made the alleged unauthorized communication.

At the remand hearing the district court offered to call the jury foreman, Canfield, but the parties stipulated that a television interview would cover Canfield's statement,[4] which in substance was that on Wednesday afternoon the jury was at an impasse and sent a note to the court accordingly. The response it received was to take the night off, which it did. The testimony of the two marshals was to the effect that if the jury wanted further instructions from the court it should communicate with the court in the morning. The district court found on the basis of the record on remand there was no merit to the claim of unauthorized communication. See 455 F.Supp. at 527–28. The record supports this finding.

Finally in claim 9 appellants contend the district court's refusal to conduct an evidentiary hearing to explore allegations of unauthorized jury experiments, improper jury communications, and the prejudicial impact resulting from the jury's experience of being trapped in an inoperable elevator for one and one-half hours on the last day of deliberations, deprived appellants of due process of law. The matter of unauthorized jury experiments has already been discussed under claim 7, and the matter of improper jury communications was explored in our limited remand hearing, and discussed under claim 8. The claim for a new trial based on the fact that the jury was stuck in an elevator at the Radisson Hotel for an hour and a half is much ado about nothing. The trial court properly dismissed this contention as being without merit. 442 F.Supp. 1226.

After considering the record as a whole I am satisfied the appellants received a fair trial and the evidence amply supports the jury's finding of guilt. I would affirm.

---

4. Counsel indicated they desired to call all jurors but made no adequate showing as to why this was necessary.