STATE v. RICHARD F. COY.

200 N. W. 2d 40.

August 11, 1972—No. 43137.

*Mutuality of Collateral Estoppel: Limits on the Bernhard Doctrine,* 9 Stanford L. Rev. 281.

282

*C. Paul Jones,* State Public Defender, and *Jerome D. Truhn,* Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *William B. Randall,* County Attorney, and *Steven C. DeCoster,* Assistant County Attorney, for respondent.

Heard before Peterson, Kelly, Todd, and MacLaughlin, JJ.

MacLaughlin, Justice.

Defendant has appealed his conviction of aggravated assault. Minn. St. 609.225. We affirm the judgment of conviction.

At about 3:15 a. m. on September 20, 1970, one Sharon Lang, age 16, awakened in her bedroom in her parents' home in St. Paul and felt an unshaven face next to hers in the bed. Sharon testified that she inquired, "Who is it?" and a man's voice responded, "Sharon, Sharon, it's Richard." Sharon asked, "What are you doing here?" and the voice replied, "[D]on't talk or don't scream * * *. Otherwise I'll stab your throat." Sharon identified the voice as that of defendant, Richard F. Coy, the owner of a nearby service station. She smelled liquor on his breath. The man took Sharon's wrist and placed her hand on a hard metallic object. Sharon testified that she could not see the object in the dark, and while she wasn't sure, she thought it was a knife. She also testified that the knife which was in evidence felt like the object which her assailant had had her touch. The man then asked Sharon to remove her clothes, but she pulled away and managed to run into her parents' bedroom where she excitedly informed them that a man was in her bedroom, that she had felt his beard, and that it was "Richard." When her parents reached Sharon's bedroom the man was gone, but the Langs saw grass clippings and grease and dirt stains on Sharon's comforter and sheet. The door from the kitchen to the outside was ajar, and Mrs. Lang could detect the odor of alcohol on the arm of Sharon's nightgown. The St. Paul police were called, and in a short time two policemen arrived. Sharon named defendant as her assailant and told the officers that he often drove a blue pickup truck.

Sharon's boyfriend, Kerry Glenn, had worked for defendant at the station for 5 or 6 months prior to the night of the alleged assault, and Sharon had visited him perhaps 50 times during that period. Sharon testified that she had talked with defendant on more than half of those visits. Defendant acknowledged that he had spoken to her on many occasions and admitted that when girls visited the station, he often would "grab them * * * and put my arm around and kid around with them." Sharon testified that she had never encouraged such conduct and had refused defendant's attentions.

The police, after interviewing the Langs and conducting an investigation in their home, drove to defendant's residence in St. Paul. There, one of the officers, seeing the blue pickup truck on the street in front of the house, felt the radiator and found the engine to be still warm. The same officer then looked through the side window of the truck and observed on the seat an empty leather sheath for a knife. The two officers proceeded to the front door of defendant's home, knocked and were admitted by defendant's wife who told them that she did not know if her husband was home because she had been sleeping on the downstairs couch. The officers were given permission to look around the house, and they found defendant, apparently asleep, in a second-floor bedroom. They woke him up, informed him that he was under arrest, and advised him of his rights. They instructed him to get dressed, and defendant put on some clothing which was on a dresser near the bed.

After placing defendant in the police car, the officer who had observed the sheath in the truck went back to the vehicle, opened the door to take the sheath from the seat, shone his flashlight around the truck, and observed the knife itself lying under the seat. The officer took both the knife and the sheath into his possession, and they were later introduced into evidence at the trial.

At trial Kerry Glenn testified that he had seen defendant make "passes or advances" at Sharon on many occasions. He further testified that he had pointed out Sharon's house to defendant on one occasion when they had driven by it; that defendant kept a knife in a sheath at the service station which Kerry had used on many occasions; and that the knife and sheath which had been taken from the truck and introduced into evidence were the same as those he had seen and used at the station.

Defendant testified that he had worked on a customer's car until nearly midnight on the evening in question and then had gone out for a drink with the customer. He testified that he had cleaned up and changed clothes before going out, but the customer testified that he could not remember whether defendant

had in fact changed clothes. Defendant had several drinks with the customer and later the same evening had more to drink at an "after hours" bar with a friend, who then drove him home in defendant's pickup truck. Defendant testified that he then went to bed and slept until he was awakened by the police officers. He claims that the clothes he put on when arrested were not the same clothes he had worn that night although they were lying over some furniture near his bed. His wife also testified that the clothes he put on when arrested had not been worn by defendant on the preceding work day. At the trial, in addition to the knife and sheath, the clothes that defendant wore after his arrest were admitted into evidence. One James Gag of the St. Paul Police Crime Laboratory made three spectrographic analyses of stains on Sharon's sheet and defendant's shirt and trousers and testified that, in his opinion, they were from the same source.

It is claimed on appeal that the taking of the sheath and knife from the pickup truck without benefit of a search warrant was an unlawful search and seizure under the Fourth Amendment of the United States Constitution; that the trial court erred in admitting the knife and clothing into evidence; that the opinion testimony of James Gag should not have been admitted; and that the evidence was insufficient to sustain the guilty verdict.

■ We have concluded that the warrantless taking of the sheath and knife from the pickup truck was constitutionally permissible. The United States Supreme Court in Chambers v. Maroney, 399 U. S. 42, 48, 90 S. Ct. 1975, 1979, 26 L. ed. 2d 419, 426 (1970), a case holding a warrantless search of an automobile to be valid, stated as follows:

"In terms of the circumstances justifying a warrantless search, the Court has long distinguished between an automobile and a home or office. [Citing Carroll v. United States, 267 U. S. 132, 45 S. Ct. 280, 69 L. ed. 543 (1925)] * * *

\* \* \* \* \*

"Neither *Carroll, supra,* nor other cases in this Court require or suggest that in every conceivable circumstance the search of an auto even with probable cause may be made without the extra protection for privacy that a warrant affords. But the circumstances that furnish probable cause to search a particular auto for particular articles are most often unforeseeable; moreover, the opportunity to search is fleeting since a car is readily movable. Where this is true, as in *Carroll* and the case before us now, if an effective search is to be made at any time, either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search."

The court went on to say (399 U. S. 51, 90 S. Ct. 1981, 26 L. ed. 2d 428) :

"Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorizes the 'greater.' But which is the 'greater' and which the 'lesser' intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment."

We think that the Chambers case is determinative of the issue before us in this case. The arrest and seizure occurred at 4 a. m., no magistrate was immediately available, the truck was readily movable, and defendant's wife was nearby and had the potential ability to move the truck or remove the knife. Certainly, the officer, having been informed that an object such as a knife had been used in the alleged crime and after seeing the sheath on the back seat of the truck, could reasonably have surmised that the

knife was nearby and therefore had probable cause to look for and seize the knife from the vehicle.

Defendant argues that Coolidge v. New Hampshire, 403 U. S. 443, 91 S. Ct. 2022, 29 L. ed. 2d 564 (1971), alters the interpretation of the Fourth Amendment rights as expressed in Chambers. Even though we doubt that Coolidge has such effect, we need not decide this contention. The instant case arose prior to the decision in Coolidge, and we do not believe that Coolidge is to be given retroactive application. In Williams v. United States, 401 U. S. 646, 653, 91 S. Ct. 1148, 1152, 28 L. ed. 2d 388, 395 (1971), the United States Supreme Court said that "[w]here the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule has been given complete retroactive effect." In our judgment, under the standard in the Williams case, the Coolidge case is not retroactive. See, also, Adams v. Illinois, 405 U. S. 278, 92 S. Ct. 916, 31 L. ed. 2d 202 (1972).

■ Defendant also argues that, assuming the knife was properly seized, it should not have been admitted into evidence because there was insufficient evidence that it was the specific weapon used in the crime. In State v. Kotka, 277 Minn. 331, 152 N. W. 2d 445 (1967), certiorari denied, 389 U. S. 1056, 88 S. Ct. 806, 19 L. ed. 2d 853 (1968), this court said that proof that defendant possessed the type of weapon or instrumentality with which the crime was committed is sufficient to make the weapon admissible.

In this case ownership of the knife was established, and it was shown that the knife was in the possession of defendant at or near the time of the assault. Sharon testified that her assailant had used the word "stab" in referring to the object he had her touch and, in fact, testified that the knife in evidence felt like the object she had felt. On these facts it was well within the discretion of the trial court to admit the knife into evidence.

■ Defendant contends that the clothing taken from him should not have been admitted into evidence because of a lack of proper foundation and probative value. Except when foundation and probative value are entirely absent, they bear on the weight of the evidence rather than its admissibility. State v. Boyum, 293 Minn. 482, 197 N. W. 2d 218 (1972). Again, the admission of this evidence was within the discretion of the trial court, and we see no abuse of that discretion. State v. Johnson, 243 Minn. 296, 67 N. W. 2d 639 (1954).

■ James Gag, the criminologist, testified to his qualifications as an expert in the spectrographic analysis of materials. On the basis of his qualifications and other evidence as to foundation, the trial court permitted him to testify. Whether the foundation is sufficient and whether the evidence of an expert is material on the issue presented are matters largely within the discretion of the trial court and that discretion was properly exercised in this case. State v. McCabe, 251 Minn. 212, 87 N. W. 2d 360 (1957); Hanson v. Christensen, 275 Minn. 204, 145 N. W. 2d 868 (1966).

■ Defendant claims that the evidence does not support the verdict. Upon a review of the evidence on a claim that it is insufficient to support the verdict, we must take the most favorable view of the state's testimony, and if that provides sufficient foundation for the jury's verdict it will not be reversed. State v. Darrow, 287 Minn. 230, 177 N. W. 2d 778 (1970); State v. Schabert, 222 Minn. 261, 24 N. W. 2d 846 (1946); State v. Armstrong, 257 Minn. 295, 101 N. W. 2d 398 (1960). We have no doubt that the evidence in this case amply supports the verdict of guilty.

Affirmed.

MR. CHIEF JUSTICE KNUTSON took no part in the consideration or decision of this case.