STATE of Minnesota, Respondent,

v.

Calvin G. DANIELS, Appellant.

No. CX-84-161.

Supreme Court of Minnesota.

Feb. 8, 1985.

Michael F. Cromett, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Vernon E. Bergstrom, Rick Osborne, Asst. County Attys., Minneapolis, for respondent.

**AMDAHL, Chief Justice.**

Appellant Calvin Daniels appeals from the judgment of the Hennepin County District Court and from the denial of a motion for a new trial or judgment of acquittal. After a 3-day trial, the jury returned a verdict finding appellant guilty of murder in the first degree for the shooting of Albert James on February 15, 1982. Appellant alleges in this appeal that the evidence was insufficient to support his conviction; that prejudicial and irrelevant evidence was improperly admitted at trial; that evidence favoring appellant was wrongfully excluded; that statements of coconspirators were improperly admitted; that identification testimony admitted at trial should have been suppressed; that requested jury instructions were improperly denied; and that appellant's closing argument was improperly limited. We affirm.

Albert James was shot to death on February 15, 1982, at approximately 2 a.m. Shortly before the shooting, he was sitting in his car in an alley in the neighborhood of Plymouth and Irving in Minneapolis, talking with Vinisha Gaines. Gaines, her mother, and a friend had met James at the Riverview Supper Club that night at about midnight, and he drove them home. The four stopped at a Perkins Restaurant for breakfast en route. Gaines lived with her mother in a townhouse at 1425 Plymouth. James pulled into the alley behind the townhouse. Gaines' mother and friend got out of the back seat of the car and went into the townhouse. Gaines then observed a brown midsize car come up the alley behind their car. James pulled his car over toward the townhouse to allow the other car through.

Shortly after James had pulled over, Gaines saw two black men near the James car. She could see fairly well because three street lights were in the vicinity, but did not recognize either man. James asked her if she knew the men; she told him she did not. The men approached the driver's side of the car. Gaines told James not to open his door; he rolled down the window instead. The man Gaines described as darker complected and taller than the other told James he wanted some "sets," a reference to "T's and Blues," two types of pills drug addicts crush and inject into them-

selves with a syringe. James said, "How many?" The taller man replied, "two sets."

James started to get the sets. The two men had two handguns pointed at James. James was told to get out of the car, but the taller man fired a shot into the car before James was able to do so. The bullet did not hit Gaines or James. The men then took James out of the car, stood him up, and searched his clothing, apparently robbing him. Gaines did not know how much money James had and did not see any drugs taken from his possession. James' wife testified that he had left the house that night with over $1,000 in his possession. Gaines gave her wallet to the shorter man; it had $16–$17 in it. The men then told James to get down, threw Gaines' wallet back into the car after taking her money, and ran. James got back into the car, where Gaines reminded him that she had said not to open the door, and James replied, "I didn't have any choice." James then got out of the car and ran in the same direction as the two men had run, down the alley.

James was two houses behind the men when he started after them. Gaines started blowing the car horn, then got out of the car, taking the keys with her. People were yelling to her, calling her by her nickname. When Gaines heard the second shot, she got down in the front seat of the car, then ran into the house. The last time she saw James, he was running down Irving Avenue; she did not see the second shot hit him.

Gaines described the taller man as darker complected and not quite 6 feet tall. The second man was "noticeably" shorter, perhaps 5 feet 4 inches tall. The men had stood side by side toward the front of James' car. The taller man wore a dark leather jacket, dark clothing, and a cap. The shorter man wore dark clothes and a dark jacket. She saw the shorter man more clearly than the taller man. She did see the taller man's face, but did not get a good look at him.

Gaines talked with the police on February 16, 1982, and gave them a statement the next day. The police showed her a display of eight photographs and she identified three photographs as possibly being the two men she saw that night. She selected the photo of Calvin Daniels as being possibly the taller man, and photos of Stanford Parker and Ben Wilson as resembling the shorter man. She thought the photo of Parker was more likely the second man than the photo of Wilson. She testified only that the photos she had picked out *resembled* the men, that she was not positive about her identification. During the photograph identification process, the police did not say they had any suspects in mind or suggest who she was to select.

A second eyewitness to the incident was Edward McConaughead. McConaughead, who was arrested on March 17, 1982, for armed robbery, testified as part of a negotiated plea agreement. In August of 1982, 6 months after the shooting, he had informed his lawyer that he had information on the shooting of Albert James and made a statement to the police. In exchange for his testimony, the charge was reduced from armed robbery to theft from person. McConaughead got probation and credit for the 6 months he had already served in jail.

McConaughead said that he was by himself the night of the shooting, and rode a bus to a downtown disco, where he met a friend. He then rode back to where he lived, 1314 Irving, and walked over to a neighborhood house party. McConaughead smoked one joint of marijuana earlier that evening. He also had two glasses of wine before he arrived at the party. He said his perception and memory were not affected by these intoxicants. He then headed home through the alley toward Irving.

McConaughead knew who Stanford Parker was, but did not know him personally. He had seen Calvin Daniels before, but did not know his name. As he proceeded down the alley, he saw James' car. He did not see a brown car drive down the alley. The street lights made the lighting very good; McConaughead saw and identified Calvin

Daniels and saw a shorter man with glasses, who he identified as Stanford Parker. He saw the two men approach the driver's side of the car, each one with a pistol in his hand, and one of the men said something like "give us the money and dope." James was starting to roll the window down and McConaughead heard a shot go off. Gaines then got out of the car and dived into the snow in back of the townhouse. Some people yelled to her to get in the house. McConaughead "got out of there" and backtracked to his home. He did not see James get out of the car. McConaughead testified that there was no question Calvin Daniels and Stanford Parker were the men who approached the car. He had previously picked the photographs of Daniels and Parker out of the display of eight photographs.

McConaughead testified that he had seen Parker and Daniels riding in a car with George Moore once, and had seen them occasionally at different establishments 2 or 3 months prior to the shooting. He said the two were noticeably different in height, and had estimated at a previous trial that Daniels was 6 feet tall and Parker 5 feet 8 inches tall. McConaughead paid no attention to what the men were wearing that night, but thought that Parker had a leather jacket and stocking hat on. He saw the men's faces under the street light as they approached the James car, but the men had their backs to him as they reached the car. He could not tell which one did the talking, but thought that Parker had fired the first shot.

McConaughead said that he never discussed what he had seen with anyone. His wife asked him about the incident and he told her he knew nothing. He also did not hear any discussion of the shooting in jail, even though Parker and Daniels were in jail at the same time he was. Gaines was a good friend, but McConaughead testified that he never talked with her about the shooting.

The final eyewitnesses to the shooting were Maurice Whitfield, then 14, and his cousin, Ramon Lester, then 13. Maurice lived at 1124 Irving in a fourplex; Ramon lived above Maurice in the fourplex at 1126 Irving. At 2 a.m. on February 15, 1982, Maurice and Ramon were upstairs at the Lesters. They were in the front room of the fourplex, which had windows facing west and north. Maurice heard two shots and looked out the north windows. He saw a man staggering, holding his side. He also saw a car coming toward his house and heard the man say, "get that car." He saw the car and said it was gray and had a big pink pillow in the back window. Maurice thought the car was a Thunderbird because he saw a little bird insignia on the small round opera windows toward the back of the car. Ramon described the car as light blue silver in color and did not see anything in the back window of the car.

The first officer to get to the scene was Bruce Meyers. He received a call at 2:03 a.m. and arrived at 1214 Irving 2 minutes later. He found James, surrounded by a crowd of 20 people, lying in the middle of the street with a gunshot wound in his lower left abdomen. After an ambulance arrived and took James to the hospital, Meyers spoke with Ramon Lester. Melvin Trammel, James' employer, who was in a nearby tippling house that night, had arrived before Meyers and did not see men fleeing on foot or in a car. James said, "Mel, they shot me." He recalled two men searching James' pockets and removing something as James lay in the street. James' wife received from the police $12.96 in change taken from James' body.

Officer Timothy Prill and his partner also responded to the call about the shooting, arriving after Meyers. After hearing some conversation about a car and being on the scene for 5–10 minutes, they left to look for a light green or blue car. On the corner of 11th and Irving, Prill found an unoccupied light aqua green car parked under a street light. Prill noticed tire tracks in the snow indicating that the car had proceeded south on Irving and then turned east onto 11th. Prill observed no tracks crossing the tracks from the car and recalled no other tracks on 11th Avenue.

Upon shining a flashlight into the car, Prill observed a handgun partially concealed under the armrest.

Some time later, three men approached the car. Calvin Daniels was one of the men, and Prill asked Daniels for identification; Daniels had no identification with him, but did give Prill his name and address. Prill noted that Daniels was about 5 feet 10 inches tall, weighed 150 pounds, was right-handed, and wore a three-piece blue suit with a light blue shirt, a striped tie, and a gray hat with a feather in the rim. Daniels did not have a topcoat on. The other men with Daniels were Stanford Parker and George Moore, the owner of the car. Daniels was frisked, and Officer Prill detected no suspicious bulges in his pockets. All three men were released after being identified. Police records list both Parker and Daniels as being 5 feet 10 inches tall; Lieutenant Hartigan testified that Daniels appears 1 or 2 inches taller than Parker.

The police towed the car. After obtaining a search warrant, the police entered the car and recovered the pistol. Photographs were introduced showing a large pink pillow and a man's dark coat in the car. The car was a green Lincoln. The day after the shooting, the two children who had observed the car were taken into the police garage and told to point out the car if they thought one of the cars in the garage was the one they had seen. There were about 20 cars in the garage. Maurice Whitfield walked up to the green Lincoln, observed that it had a little window in the back with an insignia on it, and told the police he was sure it was the car he had seen. He did not look in the car for the pink pillow. Whitfield had seen the green Lincoln in the neighborhood before, but did not associate it with the car he had seen flee the shooting until he saw it in the garage. Ramon Lester did not identify the car, but testified that the green Lincoln was not the car he had seen that night. He said the car he had observed was not as long and did not have a long taillight like a Lincoln has. There were no Thunderbirds or other Lincolns in the garage when the children looked at the cars.

The gun recovered from Moore's car did not fire either the bullet removed from James' body or the bullet found in James' car. The latter bullet was found in August of 1982, 6 months after the shooting, when Mrs. James had difficulty operating the window on the passenger's side of the car. The bullet hole was not readily apparent because the bullet had struck the edge of some plastic; the plastic then flipped back into place, covering the hole. A firearms expert found that both bullets could have come from the same gun, but may not have. The gun recovered from Moore's car, however, did not fire either shot.

Two witnesses provided additional information about the night of the shooting. Terry Henderson had been convicted of crimes such as assault, burglary, trespass, and shoplifting several times in the past. In 1983, he had been charged with burglary, damage to property, shoplifting, and simple robbery. While out on bail, he committed an assault with a knife, for which he was convicted. No plea bargain was made for this crime. He informed the police that he had information on the James shooting. A plea agreement was negotiated in which he agreed to plead guilty to theft and have the burglary and damage to property charges dismissed. The crime of theft would have required Henderson to serve 18 months in prison, but if he testified, he was promised 12 months in the workhouse instead.

Henderson had known Kathy and Joe Morgan for 6 years. He had known Parker for 1 year and met Daniels 1 month before the shooting. Henderson met George Moore the night of the shooting. Just before midnight on February 14, 1982, Henderson went to a bar and purchased two sets of drugs from a dealer. Because his syringe had broken, Henderson went by bus to the Morgans' apartment at 16th and Irving to use a syringe he knew they had. He shot the drugs at the Morgan apartment with Kathy Morgan. Henderson testified that the drug, called "T's and Blues",

does not affect perception or memory, but simply relaxes a user. Henderson had also had two or three screwdrivers to drink that night.

Henderson recalled that Joe Morgan, Parker, Daniels, and Moore then arrived. Joe Morgan preceded the other three. The four men talked and the three told Joe Morgan that they went to rob someone and something went wrong. They said that Moore's car got blocked into something, and that they expected to get T's and Blues and lots of money, but got little money and some drugs. The three wanted the Morgans and Henderson to say that they all had been playing cards that night, but did not say what happened to the person they had robbed. Henderson then left because he did not want to be involved. He said he had been at the Morgans 10–30 minutes.

Kathy Morgan also testified about the events in her household that night. Kathy Morgan has been under guardianship for over 20 years, is somewhat retarded, and had a serious drug problem with T's and Blues in 1982. She said Henderson had come over to her house about 8, 9, or 10 o'clock; she could not say for sure because the incident had occurred long ago. He stayed for a couple of hours. She said she and Henderson shot the two sets, and, 15–20 minutes later, Parker, Daniels, and Moore came over. She had known Parker for about a year and had seen Daniels a couple of times, but met Moore that night. Joe Morgan arrived shortly after the other three. Kathy Morgan saw Parker and Daniels with about 300 sets of T's and Blues in a bag. She recalled that the three wanted Joe to say that they had been with him all night playing cards and that they said they had "dusted" or "knocked" someone at 12th and Irving. Henderson left after saying he wanted to stay out of the alibi. Joe said that he and Kathy would not go along with the alibi. They asked Joe to take them to Moore's car, which he apparently did.

At the time Kathy Morgan came forward with this information, Joe Morgan was in jail serving a 42-month sentence. She had

told Henderson he might have to talk, and asked Joe to. Henderson recalled asking her if she was going to talk, and talking with her after making his statement to the police. She sat with Joe as he made his statement to the police and then made her statement on her way back home with the police in their car. The police made her no promises, but said they would try to get Joe out. Henderson testified that he knew Joe Morgan was out of jail because he testified in earlier trials.

Calvin Daniels was arrested for probable cause homicide at 10:45 a.m. on February 21, 1982, 6 days after the shooting. While being searched at the jail, police recovered a syringe from his possession. He was carrying no drugs.

 1. In reviewing the sufficiency of evidence supporting a conviction, this court makes a painstaking review of the evidence to determine if the evidence is sufficient to permit the jury to reach the conclusion that it did. *State v. Ellingson*, 283 Minn. 208, 211, 167 N.W.2d 55, 57 (1969). "If the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that defendant was proven guilty of the offense charged, the court will not disturb its verdict." *State v. McCullum*, 289 N.W.2d 89, 91 (Minn.1979), *quoting State v. Norgaard*, 272 Minn. 48, 52, 136 N.W.2d 628, 632 (1965). The court will examine the evidence by viewing it in the light most favorable to the verdict and will assume that the jury disbelieved any testimony in conflict with the result it reached. *State v. Oevering*, 268 N.W.2d 68, 71 (Minn.1978); *Ellingson, supra.*

 The jury is to determine the weight and credibility of the testimony of individual witnesses. *Ellingson, supra; State v. Engholm*, 290 N.W.2d 780, 784 (Minn.1980). Inconsistencies or conflicts between one state witness and another do not necessarily constitute false testimony or a basis for reversal. *State v. Stufflebean*, 329 N.W.2d 314, 317 (Minn.1983) (victim's testimony, considered as a whole,

found consistent). An identification need not be positive and certain to support a conviction; it can be sufficient if a witness testifies that in his belief, opinion, and judgment the defendant is the one he saw commit the crime. *Ellingson*, 283 Minn. at 210, 167 N.W.2d at 56; *State v. Gluff*, 285 Minn. 148, 172 N.W.2d 63 (1969).

█ In light of these principles, it is clear that the evidence is sufficient to support Daniels' conviction. Both Gaines and McConaughead identified Daniels as one of the men who approached the James car. Gaines testified that Daniels resembled the man and McConaughead positively identified Daniels. Maurice Whitfield identified George Moore's car as the car that fled the scene of the shooting, and Parker, Moore, and Daniels were found in the area shortly after the shooting returning to Moore's car. Terry Henderson and Kathy Morgan testified that they saw Daniels, Parker, and Moore shortly after the shooting. The men discussed the robbery, alluded to having shot someone, and tried to persuade Henderson and Morgan to assist them in creating an alibi. The jury was fully apprised of the witnesses' criminal records and plea bargains, of the drug and alcohol consumption of the witnesses the night of the shooting, and of discrepancies in the witnesses' descriptions of Daniels' wearing apparel and the sequence of events. The verdict largely depended on the jury's assessment of the credibility of the witnesses. Under the standard of review for sufficiency of the evidence, that assessment is left to the jury.

█ 2. A weapon is admissible in a criminal case if it has some relevance to the issues in the case, but is not admissible if its only purpose is to create suspicion in the minds of the jurors that because a defendant owns a gun he is likely to commit crimes. *State v. Love*, 301 Minn. 484, 221 N.W.2d 131 (1974). Physical evidence is admissible if it connects the defendant to the crime. *State v. Johnson*, 324 N.W.2d 199, 201 (Minn.1982); *State v. Marquetti*, 322 N.W.2d 316, 318 (Minn.1982). A trial court's admission of physical evidence will

be upheld unless it constitutes an abuse of discretion. *State v. Webber*, 292 N.W.2d 5, 9 (Minn.1980); *State v. Carlson*, 268 N.W.2d 553, 559 (Minn.1978).

█ Proof that the defendant possessed the type of weapon with which the crime was committed is sufficient to make that weapon admissible. In *State v. Coy*, 294 Minn. 281, 287, 200 N.W.2d 40, 44 (Minn. 1972), the court upheld the admissibility of a knife found in defendant's truck shortly after the crime was committed, despite defendant's claim that the evidence was insufficient to establish it as the specific weapon used in the crime, where the victim testified that defendant had used the word "stab" and that the knife in evidence felt like the metallic object which the defendant had forced her to touch. In *State v. Kotka*, 277 Minn. 331, 152 N.W.2d 445 (1967), *cert. denied*, 389 U.S. 1056, 88 S.Ct. 806, 19 L.Ed.2d 853 (1968), the court upheld the admissibility of defendant's .32-caliber gun because the victim died of .32-caliber bullet wounds, even though the testimony was inconclusive on whether the bullets which killed the victim were fired from that gun.

█ In the present case, the gun found in George Moore's car must be both sufficiently connected to Daniels and to the shooting to be admissible. The gun was found in the car used by Parker, Moore, and Daniels that night. The car was found near the scene of the crime, as were the three men. The car was identified by one of two children who saw it as the car which fled the scene of the shooting, and Daniels was identified by two eyewitnesses as one of the men who approached James' car that night. Daniels was also seen with a handgun at the scene. While definitely not the gun which fired the fatal shot, it could well have been one of the guns used in the crime, since each assailant had a handgun. The gun is sufficiently connected to Daniels and the crime to be admissible. *See State v. Gayles*, 327 N.W.2d 1 (Minn.1982) (court upheld admissibility of live .357-magnum bullet because it was found in the trunk of the car defendant and his accomplices used and it was a bullet that was

used almost exclusively in handguns and could have caused the flash the victim observed when he was being shot at); *Marquetti, supra* (court upheld admissibility of .22-caliber pistol taken from defendant's possession in a prior crime because it showed that a .22 pistol was his weapon of choice, helping connect him to the different .22 pistol found near him when he was arrested, and with which defendant had denied any contact); *Johnson, supra,* (court upheld admissibility of .41-caliber revolver and spent .41 casings found in defendant's vehicle shortly after an assault where the assailant had fired on the victim, even though a .22-caliber gun may have been the assault weapon; empty .22 shells were also found in the car).

3. The syringe was found on Daniels' person at the time of his arrest 6 days after the shooting. At trial, Officer Sworski testified that a syringe was found when Daniels was searched before being placed in jail. The syringe itself was not admitted into evidence. Appellant contends that the syringe does not connect Daniels to the crime and that the facts do not support the inference that the robbery was drug-related and that the assailants were drug users. Appellant also urges that mention of the syringe prejudiced Daniels by causing the jury to assume Daniels used drugs and would have been likely to commit crimes like the James shooting.

Contrary to appellant's contentions, mention of the syringe was relevant. The crime was drug-related; the assailants asked James for "sets" of T's and Blues. Kathy Morgan testified to seeing Daniels and Parker with bags of T's and Blues after the robbery. Finally, Henderson and Morgan testified that T's and Blues are injected with a syringe. Daniels' possession of a syringe was therefore relevant. In *State v. Stutelberg,* 328 N.W.2d 735, 736 (Minn.1983), the court ruled that admission of a syringe found in defendant's car when he was arrested could not have been prejudicial in light of evidence that defendant used a syringe to inject drugs into himself before and after the crime. There was sufficient other evidence that the James shooting was drug-related to blunt any prejudicial effect the mention of the syringe may have had. The trial court did not abuse its discretion in admitting testimony about the syringe.

4. Appellant twice tried to introduce photographs of the scene of the shooting. Appellant intended to use the photographs to impeach McConaughead's description of how he backtracked to his home after witnessing the first part of the shooting. Photographs are admissible when they accurately portray the scene of the crime and they are relevant to a material issue. *State v. Durfee,* 322 N.W.2d 778, 785 (Minn.1982). Photographs must show the scene of the crime as it existed at the time the incident occurred. *State v. Garden,* 267 Minn. 97, 114, 125 N.W.2d 591, 602 (1963). The admission of photographs is in the discretion of the trial judge and abuse of discretion must be shown to reverse the judge's ruling. *State v. Hines,* 148 Minn. 393, 397, 182 N.W. 450, 451 (1921).

Appellant first tried to introduce the pictures when cross-examining McConaughead. The pictures were taken 14 months after the shooting, and McConaughead testified that they did not accurately depict the scene. Appellant then withdrew the pictures. Appellant later called the defense investigator who had taken the pictures in another attempt to get the pictures in evidence. The investigator stated that in his opinion the pictures accurately represented the scene on February 15, 1982 (minus the snow); he also testified, however, that he was not at the scene on that day. The trial court properly excluded the photographs for lack of foundation.

5. Convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside only if the pretrial photographic identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification. *State v. Bishop,* 289 Minn. 188, 194,

183 N.W.2d 536, 540 (1971); *State v. Walker*, 310 N.W.2d 89, 91 (Minn.1981); *State v. Heinkel*, 322 N.W.2d 322, 325 (Minn.1982).

At the *Rasmussen* hearing, Lieutenant Hartigan testified about the procedure used in the photographic identification made by Gaines. Gaines was shown an array of eight photographs. The police selected photographs of men who resembled Parker and Daniels to fill out the array. The photographs were placed in front of Gaines and she was asked if she could identify anyone as having been at the scene of the crime. Gaines testified that there was no discussion of whom police suspected and no mention of Parker or Daniels before she was shown the pictures. She said the lieutenant asked her to look and see if the photographs resembled the persons at the scene and did not say a suspect was included in the group. She then selected the photographs of Daniels, Parker, and Wilson as resembling the men she saw.

There is simply no hint of an unnecessarily suggestive showing of the photographs to Gaines. Her identification was thus properly admitted at trial.

6. Appellant contends that hearsay statements of William Givens were improperly excluded. Givens was subpoenaed by the defense and refused to take the oath and testify. Givens was serving a 12-year sentence in the federal penitentiary and the trial court sentenced him to a consecutive sentence of 6 months in state prison for contempt of court.

Givens had been interviewed by Stanford Parker's investigator and said he was at the scene and knew who committed the crime; that it was not Daniels and Parker; that he could probably find the car and murder weapon; and that if he got a deal he could get out, speak with the real perpetrators, and get them to confess. Givens gave the same story to the state's investigator, and refused to talk unless he got a deal. A deal was refused. Givens also told a man named Ben Williams that he knew who shot James and that Daniels and Parker did not do it.

Givens testified in the trials of Stanford Parker and George Moore. In the Parker trial, he said he did not remember talking to either Parker's or the state's investigator and was not going to talk. In the Moore trial, he said he did not remember talking to the investigators and did not know Daniels or Parker.

Because Givens refused to testify, appellant sought to introduce Givens' hearsay statements by calling Grostyan, Parker's investigator, to testify as to what Givens told him. The trial court ruled these statements inadmissible. Appellant claims that the statements are admissible under Rule 804(b)(5). The conditions for admission of evidence under Rule 804(b)(5) are:

1. The declarant must be unavailable;
2. The statement must have circumstantial guarantees of trustworthiness;
3. The statement must be offered as evidence of a material fact;
4. The evidence must be more probative on the point for which it is offered than other evidence which the proponent can procure through reasonable effort;
5. Admission of the statement must serve the interests of justice and the purposes of the rules of evidence;
6. The adversary must be given advance notice of the proponent's intention to offer the statement, details about the content of the statement, and the name and whereabouts of the declarant.

*State v. Hansen*, 312 N.W.2d 96, 101 n. 3 (Minn.1981); Minn.R.Evid. 804(b)(5).

By refusing to testify, Givens was "unavailable" for purposes of Rule 804. Rule 804(a)(2) defines as unavailable a witness who persists in refusing to testify despite an order of the court to do so. The key inquiry in whether Givens' statements were admissible, however, is whether there were sufficient guarantees of trustworthiness to justify admission. In *State v. Anderson*, 284 N.W.2d 360 (Minn.1979), the court upheld the exclusion of the hearsay statement of defendant's friend that defendant had no

knowledge that property in his possession was stolen because there were no guarantees of its trustworthiness. In *Hansen*, 312 N.W.2d at 101–02, the court held that the trial court erred in admitting hearsay statements under Rule 804(b)(5) because declarant was not under oath when interviewed; the interview occurred some time after the incident; she was not subject to cross-examination when she made the statement; and her statement did not indicate firsthand observation of what she reported. *See also State v. Posten*, 302 N.W.2d 638, 641–42 (Minn.1981).

■ Many of the elements which defeated admissibility of statements under Rule 804(b)(5) in *Hansen* are present in this case. Givens was not under oath or cross-examined when he made the statements. The statements were not detailed enough to clearly indicate some firsthand knowledge of the shooting. Finally, Givens made his statements in December of 1982, 10 months after the shooting. In addition, Givens testified that he did not remember the statements in two prior trials. The only factor which indicates some reliability is that he gave similar generalized statements to three different people. This is insufficient, in the absence of other evidence of reliability, to warrant admission.

■ 7. Appellant alleges that the trial court erred in admitting the testimony of Henderson and Morgan on what Moore, Parker, and Daniels said at the Morgan residence the night of the shooting. Minn. R.Evid. 801(d)(2)(E) provides that—

A statement is not hearsay if * * * [t]he statement is offered against a party and is * * * a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

In this case, the statements were obviously offered against a party: Daniels. The statements were attributed to either Moore, Parker, or Daniels, and since the witnesses did not specifically attribute the statements to Daniels, it can be assumed that they were made by coconspirators Parker or Moore. The statements, particularly the statements about the alibi of playing cards at the Morgans, were in furtherance of a conspiracy. In *State v. Howard*, 324 N.W.2d 216, 223 (Minn.1982), *cert. denied*, 459 U.S. 1172, 103 S.Ct. 818, 74 L.Ed.2d 1016 (1983), statements designed to promote the common good of the conspirators were held to meet the "broadly construed" furtherance requirement of the rule. An alibi meets this test.

Finally, the statements were made during the course of the conspiracy. In *State v. Davis*, 301 N.W.2d 556, 559 (Minn.1981), the court said the facts of each case must be analyzed "to determine if in fact there was an agreement to conceal, to determine the closeness in time of the concealment to the commission of the principal crime, and to determine the reliability of these statements." The court in *Davis* found an agreement to conceal because the conspirators had discussed the need to retrieve the car they had used, the statements were made shortly after the incident and were made not to police but to a trusted confident whose aid was being solicited, and it was clear that the conspirators had consented to the decision to get the car. The court concluded that the trial court had not abused its discretion by admitting the evidence.

We find the present case to be controlled by *Davis*. The conspirators, Daniels, Parker, and Moore, arrived at the Morgans shortly after the shooting. They were discussing the shooting in the presence of persons they knew (Parker was a friend of the Morgans) and ended up soliciting their help for an alibi. There was evidence that the three men discussed the matter and then requested the help of the Morgans on an alibi, indicating agreement among the three to pursue a false alibi. The trial court did not abuse its discretion by admitting the statements of the coconspirators.

■ Appellant contends that if the statements of the coconspirators were admissible under the rules of evidence, their admission violated his constitutional right to confrontation, *citing* Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597

(1980), and *State v. Hansen,* 312 N.W.2d 96 (Minn.1981). As we found in *Davis,* there is no merit in defendant's confrontation clause complaint. *Davis,* 301 N.W.2d at 559.

8. As the trial was nearing an end, Daniels advised his attorney that he met another inmate at jail, Larry Wilson, who told him that he had talked with McConaughead a year before and McConaughead said he was looking for information to make a deal on a case. The men discussed the James shooting, but Wilson said he did not know anything about it. Daniels' attorney sent a clerk to get a statement from Wilson, but by the time she returned, the defense had rested. In the statement, Wilson said that he had discussed the James shooting with Daniels when they met in jail prior to his talk with McConaughead. Two days after first denying any knowledge of the James shooting, Wilson claimed that he told McConaughead details about the shooting and how he could place himself at the scene as an eyewitness.

The defense moved to reopen the case. The state claimed that it would be prejudiced by the granting of the motion to reopen because it had not had a chance to investigate whether McConaughead and Wilson had ever been in jail together with access to one another. The state also noted the opportunity for collusion between Daniels and Wilson because they were in jail together. The trial court denied the motion to reopen the defense.

This court has stated that "whether a party shall be permitted to reopen his case and present further evidence after he has rested is generally within the discretion of the trial court." *State v. Jouppis,* 147 Minn. 87, 179 N.W. 678 (1920). In *Jouppis,* the court conceded that the trial court might, in its discretion, have denied the motion to reopen, but found that the trial court had abused its discretion by excluding the additional testimony where the state had consented in defendant's request

to reopen the case and the court had permitted the witness to testify without making any formal ruling.

Appellant relies on *United States v. Larson,* 596 F.2d 759 (8th Cir.1979), to show that he was entitled to reopen the defense. In *Larson,* the court held that the trial court had abused its discretion by refusing to reopen the defense case upon discovery of a witness previously thought unavailable. The court noted that the witness' testimony was highly relevant and would have enhanced the appellant's defense. The court further noted that closing argument had not yet commenced, that a cautionary instruction would have prevented the jury from giving the testimony undue weight, and that the government was aware of the witness and had a list of available witnesses to call to rebut her testimony. *Id.* at 779. *Larson* is clearly distinguishable from the present case. In *Larson* both parties were aware of the witness and the nature of her testimony; the defense was diligently trying to locate her, while the government prepared to rebut her testimony should she be found. Larry Wilson's statement, on the other hand, was a complete surprise to both state and defense in the present case.

Unlike *Jouppis,* the testimony in this case was discovered by the appellant in a dubious manner and the state objected to the reopening of the defense. Even though the trial court could have decided to allow the testimony, the denial of the motion to reopen was not an abuse of discretion by the trial court.[1]

9. A refusal to give a requested jury instruction lies within the discretion of the trial court. No error results from a refusal to instruct where the evidence does not support the proposed instruction and no abuse of discretion is shown. *State v. Villalon,* 305 Minn. 547, 551, 234 N.W.2d 189, 192 (1975). In evaluating the trial court's instructions, this court will read them as a

---

1. We also note that the defense knew of this evidence, and of its possible relevance, before it rested, yet chose to rest anyway.

whole. *State v. Williams,* 324 N.W.2d 154, 159 (Minn.1982); *State v. Parker,* 282 Minn. 343, 358, 164 N.W.2d 633, 642 (1969). A party is entitled to a requested instruction if there is evidence to support it, but the court is not required to give the instruction if the substance of it is already contained in the court's charge. *State v. Ruud,* 259 N.W.2d 567, 578 (Minn.1977), *cert. denied,* 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978).

Appellant alleges that the trial court erred in refusing four requested instructions on credibility: (1) credibility of witnesses generally; (2) impeachment by prior felony conviction; (3) testimony of drug addicts; and (4) witness with diminished mental capacity. The trial court stated that all of the requested instructions were included in substance in its instructions.

■■■ In its preliminary instructions, the trial court told the jury that they would have to judge the credibility of the witnesses. The court instructed the jury to note the witness' interest in the outcome of the case; his opportunity or ability to remember and tell the facts; his demeanor; his sincerity; and the reasonableness or unreasonableness of his testimony in light of all the evidence. The jury was told to consider any other factors bearing on credibility, and to rely on its judgment and common sense.

In its final instructions, the court again told the jury it was the sole judge of the credibility of the witnesses, and to consider the testimony under its own experience and judgment. The jury was told that it was not obligated to accept uncontradicted testimony of an unimpeached witness if contradictions or improbabilities in the evidence furnish a reasonable ground for not believing it. The court told the jury that it could consider a witness' demeanor, relationship with the state or the defendant, and all other circumstances in assessing the weight and credibility of his testimony.

We find that the jury received ample instruction on credibility. Furthermore, the argument of counsel for both sides clearly covered the credibility issues upon which appellant requested specific instructions. The state dealt with credibility issues extensively in its closing argument. The state mentioned Kathy Morgan's limited intellectual ability, the fact that many of the witnesses had prior convictions and were in jail "all the time," and that deals were made in exchange for testimony. Appellant, of course, talked to the jury about all of the plea agreements, the prior conviction records of the witnesses, the fact that Henderson and Kathy Morgan are heavy drug users, and Kathy Morgan's low intelligence.

■■■ Appellant also contends that the trial court erred in not instructing the jury that mere presence at the scene of the crime is not sufficient to establish that defendant aided and abetted the crime. There was no evidence to support this instruction. The two men who robbed James and shot him arrived at the car together, both had handguns, and both participated in the robbery. If Daniels was found to be at the scene, there was no evidence that he was merely present. The trial court did not abuse its discretion by refusing this instruction.

■■■ Appellant's third contention is that the state's failure to preserve photographically the tire tracks in the snow which indicated that Moore's car had come from the direction of the shooting warranted an instruction on weaker and less satisfactory evidence. The trial court ruled that this subject was proper for argument and denied the instruction. Both counsel mentioned the police officer's testimony about the tracks in closing argument, appellant questioning the lack of photographic documentation of the direction of the tracks. It was not an abuse of discretion for the trial court to refuse this instruction and its omission was not prejudicial both because the issue was argued and because the direction of the tire tracks was not the major evidence linking the car to the crime.

Finally, appellant contends that the trial court erred in refusing to give the jury a specific instruction on the evaluation of an

eyewitness' identification of the defendant. This court has said that where the circumstances of the identification raise any possible doubt in the trial court's mind about the reliability of the identification, the trial court should seriously consider a request for such an instruction. *State v. Burch,* 284 Minn. 300, 170 N.W.2d 543 (1969). The danger in giving the instruction when circumstances do not warrant it is that the jury may get the impression that there is an inherent vice in identification testimony. Comment to CRIMJIG 3.16 (1977).

 The trial court denied appellant's requested instruction and did not give CRIMJIG 3.16, also an identification testimony instruction. The identification testimony of Gaines did not require the requested instruction.[2] Gaines clearly testified only that Daniels' picture *resembled* the taller man who was by James' car. The trial court did not abuse its discretion by refusing to specially instruct the jury on identification.

10. Appellant contends that the trial court improperly limited his closing argument by not allowing him to comment on the state's failure to call Joe Morgan as a witness. At the trial, the state requested this limitation because Joe Morgan was available to both sides to call and the defense had complete disclosure of all of the state's witnesses. The trial court granted the limitation by saying, "if he made complete disclosure to you, you are not to intimate that the state withheld anything from you." This ruling is consistent with *State v. Swain,* 269 N.W.2d 707, 716–17 (Minn.1978), where the court upheld the trial court's order that defense counsel not comment upon the state's failure to call a certain witness. The court applied "the general rule that no adverse inference may be drawn from a party's failure to produce evidence equally available to both sides." *Id.*

Appellant claims the need to argue the state's failure to call Joe Morgan arises

due to the state's reference to Joe Morgan in its opening argument. The state did refer to Joe Morgan in its opening argument, but not in a way as prejudicial as appellant suggests. The state mentioned Joe Morgan's lowered sentencing recommendation, given in exchange for testimony, and referred to his "horrendous" record. The state mentioned that it interviewed Joe Morgan and offered the recommendation after hearing his information. The reference to a statement Parker made to Daniels angrily saying he did not have to "waste" the person was not specifically tied to Joe Morgan, but was mentioned in a description about what the testimony of the two Morgans and Henderson showed. Then the state referred to the second proposed alibi Joe Morgan was asked to participate in—that he was with Parker and Daniels and they had been out to some bars that evening and were then at Morgan's house at the time the shooting took place.

The only part of the state's information in opening argument about Joe Morgan and his testimony that did not actually come into evidence later was the second alibi. Henderson testified that Joe Morgan was out of prison because of his testimony and a deal. Kathy Morgan testified to being present when the state interviewed Joe. Kathy Morgan testified to conversation about "dusting" or "knocking" someone, similar to the state's description in opening argument about "wasting" someone. Kathy Morgan did not remember a second alibi.

 Because there was only one fact about Joe Morgan's testimony mentioned in opening argument that did not become part of the evidence in the case, the jury instruction given on this point was sufficient to prevent prejudice to defendant:

> [T]he argument or other remarks of an attorney are not evidence in this case. Now, if an attorney has made * * * any statement as to what the evidence is

2. The requested instruction related only to the testimony of Vinisha Gaines, not to the testimony of McConaughead.

which differs from your recollection of the evidence, then you should disregard the statement and rely solely upon your own individual memory.

The court thus did not err in prohibiting appellant from arguing the state's failure to call Joe Morgan as a witness.

Affirmed.