STATE of Minnesota, Respondent,

v.

Tammy Jo SCHOENROCK, Appellant.

A15-1371

Supreme Court of Minnesota.

Filed: July 26, 2017

Court of Appeals

Lori Swanson, Attorney General, Nicholas B. Wanka, Assistant Attorney General, Saint Paul, Minnesota, for respondent.

Paul Engh, Minneapolis, Minnesota, for appellant.

## OPINION

HUDSON, Justice.

The question presented to us is whether the district court committed reversible error when it declined to include the phrase "with intent to defraud" in its jury instruction on the elements of theft by false representation under Minn. Stat. § 609.52, subd. 2(a)(3)(iii) (2016). Following a jury trial, appellant Tammy Jo Schoenrock was convicted of two counts of theft by false representation for submitting timesheets and receiving payments for personal care assistant services that she did not perform. The court of appeals affirmed her convictions, concluding that the district court did not err because its jury instructions fairly and adequately explained the law. We need not decide whether the omission of the phrase "with intent to defraud" from the jury instruction on the elements of theft by false representation was error because, even assuming that it was, the error was harmless beyond a reasonable doubt.

## FACTS

Appellant Tammy Jo Schoenrock's elderly mother, M.S., was diagnosed with Alzheimer's disease. M.S.'s health plan, Medica, authorized M.S. to receive personal care assistant (PCA) services. A PCA is a person employed by a health care agency to provide various personal services that allow the recipient of those services to live at home rather than move to a care facility. To work as a PCA, the person must pass a background check, complete required training, and receive a Certificate of Training. During the training, an individual is taught the role and responsibilities of a PCA, as well as how to respond to medical and non-medical emergencies, to control infection, to lift and transfer individuals properly, and to deal with challenging behaviors.

To be paid by the agency, the PCA must complete timesheets recording the hours that he or she has worked. The agency is reimbursed by the State of Minnesota or the recipient's health plan. The PCA's timesheets must be accurate for the proper distribution of those funds.

Schoenrock completed training, passed a competency test and a background check, and was hired by an agency, Accra Care, to serve as M.S.'s PCA. Schoenrock also signed documents acknowledging that "[t]he PCA ... can only be paid for work done when the PCA is physically present and providing medically necessary care for the [recipient]" and "cannot submit a timesheet for hours not worked." J.M., Schoenrock's close friend, became M.S.'s responsible party. A responsible party acts on behalf of a PCA-services recipient who is unable to make decisions in her own best interests. A recipient's PCA and responsible party cannot be the same person, and they both must sign the PCA's timesheets.

Schoenrock began to serve as M.S.'s PCA in spring 2010. For about a year, Schoenrock and M.S. lived together in Eden Prairie, during which time Schoenrock provided PCA services to M.S. Schoenrock was authorized to claim payments for a maximum of 9 hours of PCA services a day. In January 2011, M.S. started an adult day program. That month, Schoenrock contacted a manager at Accra Care to discuss how she should fill out the online timesheet now that M.S. was attending the day program. According to Schoenrock, the manager said, "Well, since your mother lives with you 24 hours a day, seven days a week, you can just put any hours down. Just do not go over your maximum hours."

In May 2011, M.S. became unable to navigate the stairs in Schoenrock's home. Consequently, M.S. moved in with Schoenrock's sister, L.S., who lived in a single-level home in Fergus Falls. L.S. had not passed a background check, completed the required PCA training, or received a Certificate of Training. Schoenrock informed Accra Care and Medica that she would continue to provide care for her mother by "making the trip back and forth" between Eden Prairie and Fergus Falls. Employees of Accra Care and Medica believed that M.S.'s move to Fergus Falls was a temporary solution while Schoenrock considered renovations to her Eden Prairie home.

After M.S. moved in with L.S., Schoenrock initially visited L.S.'s home frequently, occasionally spending Friday night and leaving on Saturday morning. These visits gradually declined in frequency, causing L.S. to assume the role of caregiver for M.S. But Schoenrock continued to communicate with the various care facilities and nurses to ensure that M.S. received the proper care and treatment. When M.S.'s needs increased, Accra Care authorized an additional 2 hours of care each day, which was provided by other PCAs who were compensated directly by Accra Care.

Between May 2011 and April 2012, Schoenrock and J.M. signed and submitted timesheets reporting that Schoenrock personally provided 63 hours of PCA services to M.S. each week. Schoenrock submitted the timesheets, even though she was working at another job and at one point was vacationing in Florida. Each timesheet noted that her signature verified that the hours recorded were "true and accurate" and that "[e]mployees are only paid for time they are physically present and working with the [recipient]." But in fact, Schoenrock did not provide the claimed amount of PCA services while M.S. lived with L.S. Nor did M.S. receive the amount of services claimed on Schoenrock's timesheets from another PCA during those time periods.

When M.S. was living with L.S., Schoenrock received approximately $3,000 from Accra Care every month, as well as M.S.'s social security income. Schoenrock testified that she paid L.S. approximately $1,800 per month in cash for L.S.'s care of their mother. L.S. testified that Schoenrock paid her between $400 and $500 per week, but L.S. thought the money came from M.S.'s social security income.

During the spring of 2012, employees of Accra Care and Medica discovered that M.S.'s move to Fergus Falls was permanent and began an investigation. The State ultimately charged Schoenrock with two counts of theft by false representation (over $5,000), in violation of Minn. Stat. § 609.52, subd. 2(a)(3)(iii).

At trial, the State presented evidence consistent with the facts outlined above. Schoenrock testified that when she submitted timesheets for L.S.'s care of M.S., she "had no idea" that it was "wrong or somehow illegal," and "[n]ever" had an "intent to steal any money from Accra Care." Schoenrock explained, "I figured my sister was an extension of me and I didn't really see how it mattered since I had been filling [the timesheets] out." According to Schoenrock, she had asked L.S. to be the PCA for M.S., but L.S. was not willing to become a PCA and Schoenrock "didn't want to put [her] mom into a nursing home." Schoenrock stated, "I viewed [L.S.] and myself as one unit, two daughters taking care of my mother, and [L.S.] and I shared the responsibilities and we shared the income." On cross-examination, Schoenrock acknowledged that "by filling out a time card for Accra Care, [it] was [her] intent to get paid by that time card."

Schoenrock did not dispute that the district court should instruct the jury using

CRIMJIG 16.05, which stated, in relevant part:

> Under Minnesota law, whoever obtains for [herself] the possession, custody, or title to property of another person by intentionally deceiving the other with a false representation that is known to [her] to be false, is *made with intent to defraud*, and does defraud the person to whom it is made, is guilty of a crime.

10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 16.05 (6th ed. 2016) (emphasis added). But the parties disagreed on whether the court should also instruct the jury on the specific elements of theft by false representation using CRIMJIG 16.06, which, accounting for the specific facts of this case, would provide the following elements:

> First, the defendant obtained [possession] of [monetary funds].
>
> Second, [the monetary funds were] the property of [Accra Care].
>
> Third, the defendant intentionally made a representation to [Accra Care] in order to obtain the [monetary funds]. This means that the defendant made the representation for the purpose of obtaining the [monetary funds].
>
> Fourth, the defendant knew or believed that the representation was false.
>
> Fifth, the defendant intended that [Accra Care] believe the representation to be true.
>
> Sixth, [Accra Care] believed the representation true and, in reliance on that representation, gave the defendant [possession] to the [monetary funds].
>
> [Seventh], the defendant's act took place on (or about) [the dates alleged in the complaint] in [Hennepin] County.

10 Minn. Dist. Judges Ass'n, *supra*, CRIMJIG 16.06.

Schoenrock argued that CRIMJIG 16.06 materially misstates the law because it does not include the phrase "with intent to defraud." Accordingly, she requested an instruction that would have read in relevant part: "Fourth, the defendant knew or believed that the representation was false, done with intent to defraud." The district court denied this request, determining that CRIMJIG 16.06 adequately explained the element of "intent to defraud." The district court then instructed the jury using CRIMJIG 16.05 and 16.06.

The jury found Schoenrock guilty of two counts of theft by false representation. The district court stayed imposition of the sentence for 3 years on several conditions, including payment of restitution in the amount of $37,647.33.

On appeal, Schoenrock argued that the district court committed reversible error by refusing to instruct the jury that intent to defraud is a distinct element of theft by false representation. Schoenrock relied heavily on *State v. Williams*, 324 N.W.2d 154 (Minn. 1982), a case involving payment by a check from an account with insufficient funds. The court of appeals affirmed Schoenrock's convictions, concluding that *Williams* was distinguishable. *State v. Schoenrock*, No. A15-1371, 2016 WL 3222894, at *4-6 (Minn. App. June 13, 2016). The court of appeals explained that *Williams* emphasized that a check written from an account with insufficient funds could later be covered by future deposits of funds, whereas here, there was no evidence of a similar way to cover or cure a PCA timesheet that inaccurately stated Schoenrock's hours. *Id.* at *5. Relying on *Black's Law Dictionary*'s definitions of "defraud" and "fraud," the court of appeals concluded that when viewed as a whole, the jury instructions included the element of intent to defraud. *Id.* We granted Schoenrock's petition for review.

## ANALYSIS

The issue here is whether the district court committed reversible error when it declined to add the phrase "with intent to defraud" to its jury instruction explaining the elements of theft by false representation. Denial of a requested instruction is reviewed for an abuse of discretion. *State v. Wenthe*, 865 N.W.2d 293, 302 (Minn. 2015). A district court is not required to give a party's proposed instruction if its substance is already included in the instruction proposed by the court. *State v. Daniels*, 361 N.W.2d 819, 832 (Minn. 1985). The court abuses its discretion, however, when its jury instruction materially misstates the law when read as a whole. *Gulbertson v. State*, 843 N.W.2d 240, 247 (Minn. 2014). "Whether a district court's jury instructions correctly state the law presents a question of statutory interpretation[ that] we review de novo." *State v. Davis*, 864 N.W.2d 171, 178 (Minn. 2015).

Even if a jury instruction is erroneous, a defendant is not entitled to a new trial if the error was harmless. *State v. Hare*, 575 N.W.2d 828, 833 (Minn. 1998). An error in jury instructions requires a new trial if we cannot say "beyond a reasonable doubt that the error had no significant impact on the verdict." *State v. Koppi*, 798 N.W.2d 358, 364 (Minn. 2011) (citation omitted) (internal quotation marks omitted).

Schoenrock contends that, by not including the phrase "with intent to defraud" in the jury instruction explaining the elements of theft by false representation, the district court's instruction materially misstated the law. According to Schoenrock, *Williams* clearly requires that "intent to defraud" be proved as a separate, stand-alone element of the offense. Schoenrock further argues that she did not have an intent to defraud when she knowingly submitted false timesheets because M.S. received the care she was supposed to receive and Accra Care did not pay for anything that it did not plan to pay for.

The State agrees that "intent to defraud" is an essential element of theft by false representation under Minn. Stat. § 609.52, subd. 2(a)(3) (2016). But the State argues that, viewed as a whole, the district court's jury instructions adequately explained every element of theft by false representation, including "intent to defraud." The State emphasizes that the district court defined the charged offenses using CRIMJIG 16.05, which includes the phrase "with intent to defraud," and asserts that *Williams* is factually distinguishable and inapposite. The State also contends that, even assuming the jury instructions were erroneous, the error was harmless beyond a reasonable doubt because the State presented overwhelming evidence that Schoenrock acted with an intent to defraud when she knowingly submitted false time cards.

Minnesota Statutes § 609.52, subd. 2(a)(3), defines theft by false representation as a crime committed when a person

obtains for the actor or another the possession, custody, or title to property of or performance of services by a third person by intentionally deceiving the third person with a false representation which is known to be false, made *with intent to defraud*, and which does defraud the person to whom it is made.

(Emphasis added.)

The statute also provides that

"[f]alse representation" includes without limitation . . . the preparation or filing of a claim for reimbursement, a rate application, or a cost report used to establish a rate or claim for payment for medical care provided to a recipient of medical

assistance under chapter 256B, which intentionally and falsely states the costs of or actual services provided by a vendor of medical care: . . .

Minn. Stat. § 609.52, subd. 2(a)(3)(iii).

■ The theft-by-representation statute clearly uses the phrase "with intent to defraud" to define the offense. We have held—and emphasize again today—that this phrase is a distinct element of the crime. *Williams*, 324 N.W.2d at 158-59.

■ But here, we need not decide whether these jury instructions were erroneous, because even assuming error, the error was harmless. Schoenrock argues that she did not knowingly make false representations with an intent to defraud because Accra Care did not pay for anything for which it did not plan to pay. In other words, Schoenrock defines "intent to defraud" here as an intent to obtain money from Accra Care without providing, either through herself or through a third person, the services for which Accra Care agreed to pay. Even under this definition, however, Schoenrock had an intent to defraud when she submitted false timesheets because M.S. did *not* receive the care that she was supposed to receive and Accra Care paid for services that it had *not* agreed to pay.

The following facts are undisputed. A person who has not received a Certificate of Training cannot work as a PCA. Schoenrock completed PCA training and signed employment forms. Both the training and the forms explicitly required Schoenrock to personally provide certified PCA service in order to be compensated by Accra Care. Therefore, Accra Care only agreed to pay for *certified PCA care*, not care by anyone. Schoenrock knew that her sister L.S. was not certified as a PCA, and therefore knew that the care L.S. provided M.S. was not certified PCA care. But for almost a year, Schoenrock submitted false timesheets representing that she was caring for M.S. personally and requesting reimbursement from Accra Care, even while she was working at a different job and vacationing in Florida. At the time Schoenrock signed the false timesheets, she knew that M.S. had not received certified PCA care in the amounts listed. Therefore, even under Schoenrock's definition of "intent to defraud," Schoenrock knowingly made false representations with an intent to defraud Accra Care because she had an intent to obtain money from Accra Care without providing the services for which Accra Care agreed to pay.

In light of these undisputed facts, we hold that, even assuming that the district court erred in omitting the phrase "with intent to defraud" from its jury instruction on the elements of theft by false representation, any alleged error was harmless beyond a reasonable doubt. Because the alleged omission of an essential element of the crime was harmless beyond a reasonable doubt, we affirm.

### CONCLUSION

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.